**JUDGE KOELTL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

TRANSASIA COMMODITIES LIMITED,

              Plaintiff,

      - against -

NEWLEAD JMEG, LLC.,
NEWLEAD HOLDINGS LIMITED,
MICHAEL ZOLOTAS,
JAN BERKOWITZ

           Defendants.
------------------------------------------------------------x



13 CIV 7895

COMPLAINT

**JURY TRIAL DEMANDED**

      Plaintiff TransAsia Commodities Limited, for its complaint, alleges:

## INTRODUCTION

      This action arises from a fraudulent scheme by the Defendants to inflate the share price of Defendant NewLead Holdings, Ltd ("NewLead Holdings"), a company traded on the NASDAQ stock exchange, in order to prevent that company from being de-listed. In order to achieve that goal, the Defendants created a shell company, Defendant NewLead JMEG, LLC ("NewLead JMEG") and represented to the stock buying public that NewLead JMEG, a subsidiary of NewLead Holdings, Ltd., was an active, viable and profit-making coal mining and trading company. In fact, NewLead JMEG had no coal mines, no coal, and no ability whatsoever to engage in the coal business. Nonetheless, between December 2012 and August 2013, the Defendants caused NewLead JMEG to sign a series of multi-million dollar contracts for the sale of coal, despite its inability to perform on those contracts. The contracts were then touted by the Defendant NewLead Holdings in its public filings and press releases, in

an effort to inflate the stock price of NewLead Holdings and prevent the de-listing of that company by the NASDAQ exchange.

The Plaintiff, TransAsia Commodities, signed a contract with NewLead JMEG in June 2013 to purchase several hundred thousand tons of coal. In reliance on that contract, TransAsia signed contracts with a third-party purchaser of the coal, and hired a ship to transport the coal. The Plaintiff was severely damaged when the Defendants failed to deliver the coal, and now finds itself with liability to the purchaser of the coal and the owners of the vessel it chartered to transport the coal, an inability to attract the capital it needs to finance future coal deals, and severe damage to its business reputation. By this action, TransAsia seeks to recover the damages caused by the Defendants' breach of contract and fraud.

## PARTIES

1.     Plaintiff TransAsia Commodities Limited ("TransAsia") is a foreign corporation with its principal place of business located in London, United Kingdom.

2.     NewLead Holdings Ltd. ("NewLead Holdings" and, collectively with the other corporate entities and individuals, "Defendants") is a Bermuda corporation with its principal place of business located at 83 Akti Miaouli & Flessa Street, 185 38 Piraeus, Greece. NewLead Holdings is listed on the NASDAQ Global Select Stock Market where it is traded under the symbol NEWL. NewLead Holdings describes itself as "an international, vertically integrated shipping company that manages product tankers and dry bulk vessels."

3.     NewLead JMEG, LLC ("NewLead JMEG") is a Delaware limited liability corporation with its principal place of business located at 4000 Faber Place Drive, North Charleston, South Carolina. Upon information and belief, NewLead JMEG is a Joint Venture between NewLead US and J Mining and Energy Group, LLC ("JMEG") established on April 11, 2012. On information and belief, JMEG was a Kentucky limited liability company established on November 8, 2007 and dissolved on November 1, 2008. On information and belief, Jan Berkowitz was the owner of JMEG. According to NewLead Holdings' public filings, NewLead JMEG is a "joint venture affiliate" of NewLead Holdings.

17582660.2

4.    NewLead Holdings (US) Corp ("NewLead US") is a Delaware Corporation.  On information and belief, NewLead US is a wholly owned subsidiary of NewLead Holdings.

5.    Jan Berkowitz ("Berkowitz") is a citizen of North Carolina, who on information and belief, resides at 122 Alton Court, Mooresville, NC 28117.  Berkowitz is the owner of JMEG, and is the CEO and managing member of NewLead JMEG.

6.    Michael Zolotas ("Zolatas") is a citizen of Greece.  He is the Chairman, President, and Chief Executive Officer of NewLead Holdings and has represented himself as the Chairman of NewLead JMEG. Zolotas describes himself as "a third generation ship-owner [who] has over 18 years of experience in commercial, operational, and technical management in the shipping industry."

## JURISDICTION AND VENUE

7.    This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332(a) in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and diversity of citizenship exists between plaintiff, a foreign corporation with its principal place of business in the United Kingdom, and Defendants.

8.    Jurisdiction and venue are also proper because pursuant to the operative agreement upon which this litigation is based the parties have consented to the jurisdiction and venue of this Court.  Additionally, NewLead Holdings is currently and has at all relevant times been traded on the NASDAQ Global Select Stock Market, which stock exchange is headquartered in New York City, in this district.  Additionally, and on information and belief, individual defendants Zolotas and Berkowitz have frequently traveled to and conducted business in this district.  Moreover, NewLead Holdings has previously consented to jurisdiction in New York City in other litigation matters.

## FACTS GIVING RISE TO A CAUSE OF ACTION

9.    TransAsia is a UK based company focused on trading commodities in niche markets, including coal, crude oil and oil products, throughout the world. The company is also involved in production, processing, transportation, and storage in a range of energy commodities.

17582660.2

TransAsia is owned and operated by Serge Turko, a commodities trader with several decades of experience in the commodities trading business.

10.     NewLead Holdings is an international shipping company headquartered in Greece.   Beginning in 2009 and continuing through August 30, 2013, NewLead Holdings embarked upon a reorganization of their shipping business, in the course of which they sold, disposed of, or handed over control to their lenders a total of 20 vessels or hulls under construction.   As part of the reorganization, NewLead Holdings entered into the commodities business in an effort to become a "vertically integrated shipping and commodity company."   As of the present time, upon information and belief, NewLead Holdings owns two dry bulk vessels. Despite the reduction of approximately $460 million in indebtedness through the restructuring, as of August 30, 2013, NewLead Holdings' total indebtedness was approximately $124.8 million

11.     In April 2012, NewLead Holdings, through its wholly-owned subsidiary NewLead US, entered into a joint venture agreement with J Mining & Energy Group.   J Mining & Energy Group, although dissolved in 2008, was owned by Berkowitz.   The joint venture established NewLead JMEG for the purposes of purchasing and trading energy commodities, principally coal.

12.     According to NewLead Holding's public filings, on December 20, 2012, Berkowitz was "nominated, constituted and appointed with full power to execute and legally bind [NewLead Holdings] in any and all contracts relating to coal mining and sales of coal in the United States and to act on behalf of [NewLead Holdings] in the negotiation of deals related to coal-bearing properties in the United States."

13.     On March 4, 2013, again as evidenced in the public filings of NewLead Holdings, NewLead JMEG obtained a credit facility of up to $0.5 million with a financial institution bearing an annual interest rate of 24%.   On March 8, 2013, NewLead JMEG entered into an agreement with a financial institution for a revolving credit facility of up to $1.35 million. Borrowings under this facility also bear an interest rate of 24% per annum on the unpaid principal balance.

17582660.2

14.     In August 2012, shortly after NewLead JMEG was formed, NewLead Holdings received written notification from the NASDAQ exchange that it was not in compliance with the requirements for NASDAQ listed entities because the market value of NewLead Holdings' publicly traded shares did not meet NASDAQ's minimum threshold.

15.     According to NewLead Holdings' public filings, in late 2012 and early 2013, its joint venture affiliate NewLead JMEG entered into several large Sales Purchase Agreements pursuant to which NewLead JMEG was to supply coal to third parties from mines it owned and/or operated in Kentucky.  According to subsequent filings by NewLead Holdings, virtually all of these contracts for the sale of coal have since been terminated due to NewLead JMEG's inability to perform by delivering coal to the purchasers.

16.     By way of example, during January and February of 2013, it is claimed that NewLead JMEG entered into three Sale Purchase agreements with two parties to supply over $800 million of thermal coal to be mined in Kentucky.  NewLead Holdings' public filings and press releases repeatedly pointed to these and other large coal sale contracts as an indication that NewLead Holdings was regaining financial strength.

17.     In May and June, 2013, NewLead JMEG received notices of termination on the contracts signed in January and February, 2013 due to ongoing defaults by NewLead JMEG under the agreements.  During 2012 and 2013, NewLead Holdings repeatedly informed potential investors that NewLead JMEG had signed contracts to deliver hundreds of millions of dollars' worth of coal.  On information and belief, NewLead JMEG has defaulted on every contract it signed for the sale and delivery of coal.

18.     NewLead Holdings' public filings state that in December 2012, the company entered into an agreement to purchase ownership and mineral rights to approximately 7,695 acres of land in Kentucky and 18,335 acres in Tennessee – the purported source of the coal they were selling.  According to its subsequent public filings and news releases, NewLead Holdings has been unsuccessful in efforts to obtain financing to satisfy payments under those agreements, and "as a result, the transactions did not close on their intended closing dates, and as of August 30, 2013, have still not closed."

17582660.2

19.     Following the announcements of the new coal Sales Purchase Agreements and the supposed land deals, NewLead Holdings' stock price rebounded, and the company was informed by NASDAQ in January 2013 that it had regained compliance with NASDAQ listing requirements and would not be delisted, as had previously been threatened. In the following months, the company repeatedly sought and obtained amendments of the sales agreements for the purchase of the Kentucky and Tennessee properties, extending the dates for the closing on those properties multiple times due to the company's inability to obtain the financing necessary to proceed to closing. Upon information and belief, as of the present date, NewLead Holdings is in default of its obligations under those agreements.

20.     On September 13, 2012, NewLead Holdings received another written notification from NASDAQ indicating they were not in compliance with NASDAQ Listing Rule 5450(b)(3)(C) for  continued listing on the NASDAQ Global Select Market because the market value of the Company's publicly held shares was below $15 million for the previous 30 consecutive business days. On that same date, they were also informed in writing that they were not in compliance with NASDAQ Listing Rule 5450 (a)(1) because the minimum bid price of their common shares was below $1.00 per share for the previous 30 consecutive business days. NewLead Holdings was then granted a 180 day compliance period to regain compliance with the NASDAQ Listing Rules, and on January 24, 2013, they were notified that they had regained compliance with the minimum bid price requirement because the closing bid price of their common shares had exceeded $1.00 for ten consecutive business days.

21.     Then, on April 4, 2013, NewLead Holdings was informed once again by NASDAQ that the minimum bid price of the company's shares was below the $1.00 minimum bid requirement and were granted a 180 day compliance period ending on October 1, 2013. In a press release dated October 4, 2013, NewLead Holdings announced that it had failed to meet the minimum $1.00 per share bid price for a ten day period, and had been notified that it had not regained compliance. The company's stock will therefore be delisted unless the company requests a hearing on or before October 9, 2013.  According to a NewLead Holdings press release, the company expects to regain compliance through a 1-to -15 reverse split of its common shares that is scheduled to occur on or before October 17, 2013.  As of October 15, 2013, the common stock of NewLead Holdings was trading at nine cents per share.

6

17582660.2

## TransAsia enters into a Coal Purchase Agreement with NewLead JMEG

22.     In the spring of 2013, contemporaneously with NewLead Holdings' renewed difficulties in qualifying for continued listing on NASDAQ, Berkowitz, acting on behalf of NewLead JMEG, met with Tom Zabrodsky, an experienced commodities trader and independent contractor who was working for TransAsia in the United States, regarding a potential deal for the sale of coal. At that time, Berkowitz represented to Zabrodsky that he worked for a company called "New Coal Holdings".

23.     In the Spring of 2013, TransAsia was becoming active in the purchase and resale of coal to be sold to buyers in Asia and South America. At that time there was strong demand for high-sulfur coal from certain Indian companies, and TransAsia was looking for coal to sell to the Indian customers.

24.     In order to learn more about NewLead and Berkowitz, in May, 2013, Zabrodsky, acting on behalf of Trans Asia, flew to Charlotte, North Carolina, to meet with Berkowitz.

25.     During that meeting, Berkowitz told Zabrodsky that NewLead JMEG and /or his other company, "New Coal Holdings", owned coal mines and a "wash plant" (a facility that cleans coal), all of which were located in Kentucky. Berkowitz represented to Zabrodsky that NewLead JMEG owned the coal being offered for sale, and assured him that NewLead JMEG was not a coal broker. TransAsia was an attractive target for NewLead JMEG because TransAsia had access to credit facilities and to customers who were ready and able to sign contracts for the delivery of large amounts of coal, both of which could be used to leverage the stock price of NewLead Holdings.

26.     TransAsia had relationships with potential customers for coal throughout the world, as well as access to trade finance banks capable of providing letters of credits and other financial securities necessary to secure a sale.

27.     Berkowitz and Zabrodsky initially discussed two potential long term coal deals amounting to approximately $220 million.  Berkowitz also raised the possibility of obtaining financing from TransAsia by means of advance payments utilizing these two "offtake" contracts

7

as security. Berkowitz stated that this would help NewLead acquire additional assets and ensure TransAsia would have secure supply sources.

28.     The first potential coal deal was with a Brazilian company that was seeking to acquire "washed" coal of the type allegedly produced by NewLead JMEG's Kentucky mines and "wash plant".

29.     As part of the Brazilians' due diligence in connection with the potential purchase of washed coal from NewLead JMEG, they sent a team to the United States in order to meet Berkowitz and visit the wash facility and coal mines purportedly owned by NewLead JMEG, and from which the coal was supposed to be produced.

30.     Berkowitz took the Brazilians to the wash plant in Kentucky, but their visit to the facility was limited by Berkowitz to 15 minutes.  Berkowitz never took the due diligence team to "his" mine, supposedly because it was "too far" for the group to visit that day.  Berkowitz also refused to complete a mandatory environmental questionnaire that the Brazilians required their coal suppliers to complete.  These failures caused the Brazilians to abandon the potential deal.

31.     At the same time they were working on the washed coal opportunity for the Brazilians, Berkowitz and TransAsia began discussions regarding a separate deal for high sulfur coal to be exported to a cement company in India.

32.     High sulfur coal mined in the United States is used by Indian cement companies as an alternative to scarce and increasingly expensive petroleum coke.  TransAsia knew that an Indian company, Shree Cement, was interested in purchasing such coal.

33.     After learning of this opportunity, Berkowitz represented to TransAsia that he could supply high sulfur coal from NewLead JMEG's coal mines in Kentucky for shipment to Shree Cement in India. The coal would be transported by NewLead JMEG from Kentucky down the Mississippi River, where it would meet a vessel chartered by TransAsia that would be waiting in New Orleans. From there, it would be shipped to India.

34.     On June 14, 2013 in reliance upon representations made by Berkowitz regarding his ability to deliver coal, TransAsia entered into a Coal Sales Agreement ("CSA") with Shree

Cement ("Shree"), a manufacturer of cement and cement products located in Kolkata, India. The CSA is attached hereto, incorporated herein and marked as Exhibit "A". Pursuant to the terms of the CSA, TransAsia agreed to sell and deliver 110,000 metric tons of coal to Shree. TransAsia and Shree agreed that if the first transaction was successful, Shree would continue to purchase coal from TransAsia on a monthly basis for a period of twelve months.

35.     In order to satisfy its obligations to Shree under the CSA, TransAsia in turn entered into a Coal Purchase Agreement ("CPA") with NewLead JMEG on June 21, 2013. The CPA is attached hereto, incorporated herein and marked as Exhibit "B".

36.     The CPA provides that NewLead JMEG will provide TransAsia with an initial shipment of 110,000 Metric Tons of coal in July 2013 and contemplates an extended deal at buyer's option through July 2014 for additional coal. Coal was to be delivered to TransAsia FOB the vessel at New Orleans. *See* CPA ¶ 3.0.

37.     In order to induce TransAsia to enter into the CPA, Berkowitz repeatedly informed TransAsia that NewLead JMEG owned the coal in question, and that it was prepared to deliver it FOB New Orleans. For example, on June 10, 2013, in response to questions from Serge Turko ("Turko"), the owner of TransAsia, Berkowitz represented in writing that he owned the coal, that he controlled the shipping of the coal from the mine to the load out station, and that once loaded on barges it would take 14 days to reach New Orleans. As for scheduling the delivery, he wrote "let me know when you want the product at this time …WE are the expeditor. …" Asked who would liaise with vessel agents to arrange shipping documents, etc., Berkowitz replied "my shipping department". In order to induce TransAsia to enter into the CPA, Berkowitz repeatedly assured TransAsia that he was an experienced coal trader, and that he owned the coal and the "outloading station" where the barges would be loaded, and that he had the ability to perform under the CPA. Every one of these representations was false and known by Berkowitz to be false when made, and were made with the intent to induce TransAsia to enter into the CPA.

38.     As a further inducement to TransAsia to enter into the CPA, and as proof that it owned the subject coal, Berkowitz provided several analysis reports prepared by a company called "SGS North America, Inc." On information and belief, SGS is a universally recognized

9

independent assayer of coal, and their analyses of coal quality are utilized by the coal industry all over the world.

39.    The "SGS Reports" provided by Berkowitz purported to show the quality of the coal that Berkowitz had represented he owned, including, inter alia, the percentages of nitrogen, sulfur, oxygen and moisture in the coal that was tested.  Two such SGS reports, dated March 18, 2013 and May 24, 2013, were  addressed to "NewLead JMEG, LLC" and "J Mining & Energy Group, Inc." The SGS reports were provided by Berkowitz to TransAsia prior to execution of the CPA, and purported to show the specifications of the coal NewLead JMEG was selling to TransAsia.

40.    Unknown to TransAsia, both of the SGS Reports identified above had been doctored and were forgeries, created by Berkowitz and/or Zolotas using SGS letterhead without the company's knowledge or permission in order to induce TransAsia to enter into the CPA.  On information and belief, SGS did not issue these reports, and did not give permission to NewLead JMEG, Berkowitz, or anyone else to do so.

41.    Following the execution of the CPA, Berkowitz provided TransAsia with several additional SGS Reports that he represented were authentic. On information and belief, almost all of the SGS Reports provided to TransAsia by Berkowitz were forgeries.

### TransAsia Fulfills its Contractual Obligations Under the Coal Purchase Agreement

42.    In order to fulfill its contract with Shree to transport coal from the United States to India, TransAsia needed to charter a specific type of vessel, known in the shipping industry as a "Baby Cape", a type of ship that is large enough to carry 115,000 metric tons of coal from New Orleans to India.  The voyage to India from New Orleans takes approximately 42 days, and the freight costs are substantial. In order to locate and reserve, or "fix" such a vessel, a 45 day window is needed.  It is therefore imperative for the party responsible for making shipment to take great care to have the cargo at the port ready to begin loading on the day that the vessel arrives.  Large sums of money depend on getting the logistics of the delivery process right, so that the coal is mined, shipped, and arrives at the loading port at the same time as the transport vessel, which is often traveling from another continent to meet its cargo.

10

17582660.2

43.     In accordance with the CPA, and in reliance on the representations of Berkowitz on behalf of NewLead JMEG, on July 9, 2013, TransAsia located a vessel, the "UBC Ottawa" (the "Ottawa") and signed a contract, known as a "Charter Party", for the Ottawa on July 17, 2013.  At that time the Ottawa was en route to Germany to discharge its onboard cargo, and would steam to New Orleans, pick up the coal to be delivered by NewLead JMEG, and transport the coal to India.  The cost of this voyage was set at $34.50 per metric ton, which meant that the cost of the voyage was $3,915,750 plus additional costs in the event the vessel was delayed, and the cost for any delays was set at a daily rate of $19,300 on a pro-rata basis.  A Copy of the Charter Party is attached as Exhibit "C."

44.     Throughout the duration of its journey across the Atlantic Ocean, the Ottawa's operators provided regular email updates regarding its position.  NewLead JMEG, Berkowitz and Zolotas were copied on all these emails.  At no time did NewLead JMEG, Berkowitz or Zolotas indicate to TransAsia or the Ottawa that it would be unable to provide the coal it had contracted to supply under the terms of the CPA upon the arrival of the Ottawa in New Orleans.  To the contrary, Berkowitz and Zolotas assured TransAsia on an ongoing basis that the coal was in New Orleans and that they would be ready to load the coal upon the Ottawa's arrival.

45.     Although payment for the coal was to be made following delivery, the CPA required TransAsia's bank to issue to NewLead JMEG  a Letter of Credit as a form of payment security for 110% of the shipment's value within 30 days of the "layperiod" (the date on which the ship arrives in port and is ready to be loaded). *See* CPA "Billing and Payment" provision.

46.     On information and belief, TransAsia's ability to provide a Letter of Credit from a reputable bank  made it an attractive target for NewLead JMEG et al., as a Letter of Credit could potentially be utilized by NewLead Holdings and the other defendants as collateral for the credit they desperately needed.  In accord with its contractual duties, on or about July 19th, 2013, TransAsia's bank, NBAD Private Bank (Suisse) SA., issued a Letter of Credit that was advised through NewLead JMEG's bank in Geneva, Switzerland - BNP Paribas (Suisse) SA. NewLead JMEG was informed by BNP Paribas of  its receipt of this  Letter of Credit.

47.     Ten days after TransAsia had presented NewLead JMEG with a "Documentary Letter of Credit" issued by its bank, NBAD Private Bank (Suisse) SA., Zolotas first became

11

involved in the transaction. Specifically, Zolotas contacted Serge Turko, who was TransAsia's owner, and asked him to provide a "Stand by Letter of Credit" in lieu of the Documentary Letter of Credit that had been provided by TransAsia. It is now clear that Zolotas wanted a Stand By Letter of Credit because that type of instrument can be used as collateral to obtain funds, whereas a Documentary Letter of Credit cannot. Turko did not agree to provide a Stand By Letter of Credit as NewLead JMEG, Berkowitz and Zolotas would be capable of drawing down funds under the Stand by Letter of Credit without actually delivering the coal.

### NewLead Misrepresents its Ability to Fulfill the CPA

48.    In the weeks that followed the execution of the CPA, TransAsia sought to obtain more information regarding the coal it was buying from NewLead JMEG, Berkowitz, and Zolotas. During this period, NewLead JMEG, Berkowitz, and Zolotas misrepresented the status of the coal on multiple occasions in order to mislead TransAsia. For example, in an email dated July 29, 2013, Berkowitz falsely assured TransAsia that a contract was in place between NewLead JMEG and the Ingram Barging Company to transport the coal to New Orleans from the load out station, that he had stockpiles of coal at the load out station that was ready to ship, and that different coal grades would be blended in order to meet the specifications for coal "per our contractual terms."

49.    The CSA and CPA both set forth "laydays" of July 19-29, 2013 in New Orleans. The laydays are the specific time period during which an ocean-going vessel must arrive and be available for loading. The laydays are critical because once a vessel is compelled to sit and wait for loading outside of that time window, the chartering company- TransAsia -  is required to pay "demurrage" -- the cost of the vessel sitting empty in port -- at a cost of almost $20,000 per day to be paid to the vessel operator.

50.    NewLead JMEG was aware that in order to fulfill its contractual obligations under the CPA, it needed to obtain, ship and deliver its coal to the port of New Orleans (referred to as "NOLA" in the contract) within that time period. After the CPA was signed, Berkowitz repeatedly assured TransAsia he had arranged for shipment and delivery of the coal in order to meet NewLead JMEG's delivery obligations.

17582660.2

51.     Due to delays in locating an appropriate vessel able to sail to New Orleans within the original layperiod, the parties were forced to amend both the CPA and CSA to modify the layperiod and avoid demurrage. The amended CPA is attached hereto, incorporated herein and marked as Exhibit "D"; the amended CSA is attached hereto, incorporated herein and marked as Exhibit "E."

52.     The amended agreements specified a layperiod of August 25-September 5, 2013. Pursuant to the CPA, NewLead JMEG had two days to notify TransAsia that the layperiod was not acceptable.  CPA ¶ 2(a). NewLead JMEG did not provide that notice, and the parties proceeded in accordance with the August 25-September 5 layperiod for loading the coal onto the ocean-going ship.

53.     During the time that TransAsia was seeking an appropriate vessel to transport the coal, representatives of the Indian purchaser, Shree, traveled to the United States to conduct due diligence in connection with the CSA. Zabrodsky traveled with the Shree delegation to Lexington, Kentucky.  Shree had requested to see the mines and the wash plant allegedly owned by NewLead JMEG.

54.     On or about July 24, Turko met personally with Berkowitz in Norfolk, Virginia. Berkowitz assured Turko that all arrangements were in place and Shree would be visiting the mine, wash plant and the load out facilities which Berkowitz had represented that NewLead JMEG owned. Berkowitz also indicated that Shree would "see with their own eyes and would be able to touch the coal that was to load on the vessel Ottawa". The coal which Shree did in fact see and touch during their visit, and the load out facilities did not belong to Berkowitz or NewLead JMEG.   On information and belief, the load out terminal belong to an individual named Dan Taylor.

55.     The group first visited the wash plant which Berkowitz had repeatedly represented was owned by New Coal Holdings, an affiliate of NewLead JMEG and NewLead Holdings. The wash plant was not operating, but Shree and Zabrodsky visited the facility and observed industrial equipment that they were informed belonged to New Coal Holdings.

17582660.2

56.     The group also visited a coal load out station on the Kanawha Canal, in Kentucky. Berkowitz's representative, a person named Rick Thacker, also told the Shree representatives and Zabrodsky that Berkowitz owned the load out station, which is called "Riverway". This information was subsequently determined to be false.

57.     According to the CPA, the coal was to be brought from the mine to the load out station, where it would be loaded onto barges. The barges would move the coal to the Ohio River and eventually the Mississippi River from where it could be barged to New Orleans to be loaded onto the TransAsia vessel. It would take 10 days to load the barges and it takes approximately 14 days for the barges to reach New Orleans from the Riverway load out station.

58.     While at the load out station, Thacker pointed to piles of large coal chunks on the ground that he claimed belonged to Berkowitz, and told Zabrodsky that NewLead JMEG had 100,000 tons of similar "large coal". The Shree group was impressed with the large coal that Berkowitz showed them. Zabrodsky later learned that the large coal had been purchased by Berkowitz from another coal supply company.

59.     Thacker did not take Zabrodsky or the Shree group to the Kentucky mine that day because it was supposedly "too far."

60.     The coal was to be loaded onto the vessel for transport to India through a process called "midstreaming". Midstreaming is an alternative process for loading coal onto an ocean-going vessel whereby the ocean-going vessel is not docked at a land-based terminal. Rather, a series of barges is used to transport the coal to the vessel which sits floating in the Mississippi river. When a coal shipper uses a traditional land-based loading technique, the shipper does not need to be as concerned with barge demurrage because the coal is often loaded right onto the ocean vessel upon its arrival at the terminal. Midstream loading, however, requires that careful attention be paid to coordinating the shipment of barges with the arrival of the vessel. Ideally, all of the loaded barges should be fleeted at the midstream loading site and ready to load on the first day of the vessel's laydays.

61.     As the supplier, NewLead JMEG was required to engage a contractor to handle the midstreaming and a barging company to deliver the coal. NewLead JMEG represented to

14

TransAsia that it had engaged Ingram Barge Company ("Ingram") to handle the barging, and that it had contracted with Associated Terminals to perform the midstreaming operation. It was subsequently discovered that neither Ingram nor Associated Terminals ever signed contracts with NewLead JMEG, Berkowitz, Zolotas, or any of their affiliated companies.

62.    On or around August 4, 2013 Berkowitz provided TransAsia with "barging schedules," which are documents that show schedule for the movement of coal from the load out station all the way to New Orleans. On many occasions both Berkowitz and Zolotas knowingly and falsely indicated the barging was in place. However, TransAsia later learned that the barging schedules provided by Berkowitz were never implemented.

63.    The schedule provided by Berkowitz to TransAsia acknowledges that it would take 6-8 days to load the barges at the load out station and 10-18 days for the total coal order to be barged to New Orleans.  Although the schedule was never implemented, the timeframe set forth in the fabricated barging schedules was commercially reasonable, and consistent with TransAsia's expectations.

64.    Based on the schedule provided to TransAsia, NewLead would need to commence barging coal from the Riverway load out station no later than  18-21 days before the end of the layperiod.

65.    Rather than inform TransAsia that it would be unable to satisfy its obligations under the CPA, New Lead, Berkowitz and Zolotas repeatedly represented to TransAsia that the coal was at The Riverway load out facility and both the barging and midstreaming arrangements in New Orleans were in place. During this period, TransAsia was assured on a daily basis by Zolotas and Berkowitz that the contract was on schedule. Later, Zolotas informed TransAsia that the coal was being purchased from a 3rd party and was not coming from NewLead owned mines.

66.    At all times, Zolotas and Berkowitz reassured TransAsia that the coal would be delivered as per the CPA. Virtually every one of the dozens of representations made by Berkowitz and Zolotas regarding their ability and intent to deliver the coal during this period were false and known to be false by Zolatas and Berkowitz.

15

## NewLead Demands Prepayment and Fails to Deliver the Coal

67.     Finally, on or around August 24, 2013, 2 days prior to Ottawa's arrival in New Orleans, Zolotas emailed TransAsia, stating that there was an "issue", because the coal supplier had "changed gears at the last minute." Zolotas told TransAsia that in order to receive the coal, they needed to amend the financial terms of the transaction, and sought a $1,000,000 prepayment from TransAsia in order to pay their "supplier" for the shipment.

68.     This news stunned TransAsia, who had previously been informed on multiple occasions that the coal they were buying belonged to NewLead JMEG, not some unnamed "supplier". TransAsia refused to make this prepayment as there was no assurance the coal in fact existed.

69.     In the days that followed Zolotas and Berkowitz both kept up the deception. For example, on August 24, 2013 Zolotas told TransAsia that "the coal is located in Nola and barge have been informed." Zolotas repeatedly assured Turko that he was being "transparent" and "straight forward" in his dealings with TransAsia. All of these statements were false and known to be false by Zolotas when made.

70.     In an email to Turko dated August 24, 2013, Zolotas stated that he was the "chairman" and that Berkowitz was the "CEO" of NewLead JMEG.

71.     Although Turko demanded additional information to support and justify the prepayment, none was provided. In the meantime, the Ottawa continued on its journey to New Orleans.

72.     The Ottawa arrived in New Orleans on or around August 26, 2013. TransAsia provided NewLead JMEG with the requisite notice of its arrival in accordance with the CPA. *See* CPA ¶2(b).

73.     No coal was delivered to New Orleans by NewLead JMEG

74.     Despite this, Turko was repeatedly assured by Zolotas that the "coal is there for you and your clients." Then, TransAsia was informed that the coal had been transported to New Orleans under the name of the unidentified "supplier" rather than from the NewLead JMEG

17582660.2

owned coal mine. Zolotas now said that all that was needed was for TransAsia to make the $1,000,000 prepayment.

75.     Desperately seeking to find a solution, TransAsia demanded information regarding the coal supplier and the suppliers' capabilities. Again, Zolotas stalled, promising to "manage and resolve it" and repeatedly assured TransAsia that the "coal is in Nola." (*i.e.*, New Orleans).

76.     Berkowitz provided similar assurances, which Berkowitz knew to be false, promising to send TransAsia the SGS composite analysis done for coal that he claimed was in New Orleans and ready to be loaded.

77.     On or around August 27, 2013, TransAsia requested the letter of credit issued by TransAsia to NewLead JMEG to be cancelled by NewLead. TransAsia received notice a few days later that the Letter of Credit was cancelled. Zolotas acknowledged that NewLead JMEG had not performed pursuant to the CPA, and promised TransAsia that "even if you have losses we will cover your losses. We stand on our principals."

78.     In numerous subsequent written and oral communications to Turko and Trans-Asia, Zolotas acknowledged that NewLead JMEG had breached the CPA.

79.     On August 28, 2013, Zolotas wrote to Turko that "I respect the fact that you have losses" and promising that when "the dust settles we will arrange for your remuneration."

80.     Upon learning of NewLead JMEG's breach of the CPA, TransAsia sought to arrange an alternate source of coal for Shree Cement, but was unable to find a grade acceptable to the company, and Shree was compelled to procure alternate cargo from a separate supplier.

81.     On September 1, 2013, TransAsia requested written confirmation from NewLead JMEG that no coal would be available for loading onto the Ottawa. TransAsia needed to inform the vessel owners to provide them with the opportunity to find alternate cargo before the layperiod closed on September 5.

82.     Finally, on September 4, 2013, Zolotas provided TransAsia with "official notice" that "NewLead JMEG will not be able to load the vessel MV UBC Ottawa due to logistic

17

issues." Again, NewLead JMEG, Zolotas and Berkowitz failed to disclose the truth to TransAsia, stating logistics was the issue, when in fact NewLead JMEG did not have the coal. Ingram has confirmed to TransAsia that they were ready to ship the coal and the barges were available but NewLead JMEG never brought any coal for them to ship down the river.

83.     Upon receipt of this notice of breach, TransAsia informed the vessel owner and released the vessel. The Ottawa sat on demurrage in New Orleans for at least 20 days until the vessel owner was able to find an alternative cargo. The daily rate for demurrage was established at $19,300 per day.

84.     The CPA requires that demurrage be paid by the seller. CPA ¶¶ 3(b); 4(a).

### NewLead's Fraudulent Misrepresentations

85.     Both prior to and following execution of the CPA, Zolotas and Berkowitz, on behalf of the NewLead entities, consistently and systematically misrepresented their capacity to deliver the coal specified in the CPA. These misrepresentations include but are not limited to:

    (a)     Claiming to own one or more coal mines in Kentucky;

    (b)     Claiming to own a wash plant in Kentucky;

    (c)     Claiming ownership of the barge load out facility and related equipment on the Kanawha canal;

    (d)     Stating that they had entered into a barging contract with Ingram.

    (e)     Stating that they owned the coal seen during the site inspection.

    (f)     Providing barging schedules which Zolotas, Berkowitz and NewLead had no intention to put in place.

    (g)     Providing forged SGS Reports to TransAsia.

86.     As a result of the defendants' fraud and their breach of the CPA, TransAsia has and will continue to incur substantial direct and consequential damages.

17582660.2

87.     TransAsia has been damaged by its reliance on the intentional, material, and fraudulent misrepresentations made by Zolotas and Berkowitz in their individual capacities, and on behalf of NewLead JMEG and NewLead Holdings. These damages include but are not limited to direct damages that TransAsia will be required to pay to Shree Cement for its non-performance of the CSA, damages that will be owed to the owners of the Ottawa, and TransAsia's costs of financing the Letter of Credit.

88.     In addition, TransAsia has and will sustain consequential damages due to the defendants' fraudulent conduct, including but not limited to lost profits, an inability to obtain the required capital to conduct its business, credit facilities and/or obtaining credit terms at more disadvantageous rates, and loss of its business reputation.

89.     The aforementioned false statements and forged documents were made with the intent to induce and did so induce TransAsia to enter into the CPA and to prevent TransAsia from discovering the Defendants' fraud both before and after the CPA was executed.

90.     The aforementioned false statements and forged documents were made with the intent to cause and did so cause TransAsia to provide financial support to the Defendants; to enable the Defendants to borrow against the TransAsia Letter of Credit; and in order to enable defendants to tout the CPA, which NewLead Holdings intended to use as proof of its financial viability, in its public filings, in order to induce investors to buy its stock – and by doing so prevent NewLead Holdings from being delisted by NASDAQ and to cause financial gain to NewLead Holdings, Zolotas and Berkowitz by using what was a shell company (New Lead JMEG) to perpetrate a fraud upon TransAsia.

## COUNT I - BREACH OF CONTRACT AGAINST NEWLEAD JMEG

91.     TransAsia hereby repeats, realleges, and incorporates by reference and makes a part hereof the allegations in the preceding paragraphs, as if set forth herein at length.

92.     TransAsia and NewLead JMEG entered into a contract on June 21, 2013.

93.     TransAsia has performed all of its obligations under the CPA.

94.    NewLead JMEG breached the CPA by failing to sell and deliver coal as set forth in Section 1.0 of the CPA.

95.    Defendants have admitted their breach of the CPA.

96.    As a result of defendant's breach of the CPA, TransAsia has been damaged, including but not limited to, incurring substantial losses from its inability to perform on the CSA and payment of demurrage fees to the owners of the Ottawa.

97.    Based on the foregoing, TransAsia is entitled to direct and consequential damages in an amount to be determined through discovery, but believed to be no less than $2,978,560.

98.    Pursuant to section 4(a) of the CPA, TransAsia is entitled to recover all losses incurred due to defendant's breaches.

## COUNT II – COMMON LAW FRAUD AND FRAUDULENT INDUCEMENT AGAINST ALL DEFENDANTS

99.    TransAsia hereby repeats, realleges, and incorporates by reference and makes a part hereof the allegations in the preceding paragraphs, as if set forth herein at length.

100.    Prior to the parties' entry into the CPA, Defendants NewLead JMEG and NewLead Holdings either directly or through their designated officers and agents Berkowitz and/or Zolotas deliberately made multiple material misrepresentations, including, inter alia;

      (a)    their ownership of coal for sale to TransAsia;

      (b)    their ownership of coal mines in Kentucky and Tennessee;

      (c)    their ownership of a coal wash facility located in Kentucky;

      (d)    their ownership of a loading station for the transport of coal;

      (e)    the availability and sourcing of coal to be provided under the CPA.

101.     Subsequent to the parties entry into the CPA, Defendants NewLead JMEG and NewLead Holdings either directly or through their designated agents Berkowitz and/or Zolotas deliberately misrepresented, inter alia;

        (a)     their ability to perform under the CPA;

        (b)     that they had shipped coal to New Orleans;

        (c)     provided false barging schedules;

        (d)     provided false SGS analyses for coal that they falsely claimed they owned;

        (e)     falsely claimed that they had a supplier of coal that would enable them to fulfill the CPA;

        (f)     made multiple intentionally false statements intended to prevent TransAsia from discovering their fraud.

102.     All of the foregoing material misstatements, misrepresentations, and/or omissions were known by Defendants to have been false when made, were made by Defendants deliberately and with an intent to deceive TransAsia, and to deprive TransAsia of the benefit of the CPA.

103.     Defendants intended that TransAsia would justifiably rely on each such misrepresentation and omission.

104.     TransAsia reasonably relied to its detriment upon Defendants' misrepresentations and omissions.

105.     As the result of said reliance, TransAsia has incurred and will incur direct and consequential damages in an amount to be determined.

106.     The fraudulent and tortious conduct of the Defendants evinced a high degree of moral turpitude and wanton dishonesty.

21

17582660.2

107.     The Defendants' fraud was aimed at the public generally, as the goal was to fraudulently inflate the share price of NewLead Holdings.

108.     The Defendants' conduct just6ifies the award of consequential and punitive damages.

## COUNT III – CIVIL CONSPIRACY AGAINST ZOLOTAS AND BERKOWITZ

109.     TransAsia hereby repeats, realleges and incorporates by reference and makes a part hereof the allegations in the preceding paragraphs, as if set forth herein at length.

110.     Zolotas and Berkowitz had an agreement to create NewLead JMEG and to utilize it as a sham company in order to inflate the share price of NewLead Holdings by defrauding customers such as TransAsia.

111.     In order to further this fraudulent scheme, Zolotas and Berkowitz both intentionally misrepresented material facts and induced plaintiff to enter into the CPA.

112.     As a result of the aforementioned misrepresentations and the conspiracy, TransAsia has suffered damages and injury in an amount to be determined.

## COUNT IV – ALTER EGO

113.     TransAsia hereby repeats, realleges, and incorporates by reference and makes a part hereof the allegations in the preceding paragraphs, as if set forth herein at length.

114.     Upon information and belief, Berkowitz is the sole managing agent of NewLead JMEG. Berkowitz and Zolotas have represented Berkowitz to be the CEO of NewLead JMEG, and he was acting in that capacity when he entered into the CPA on NewLead JMEG's behalf.

115.     Upon information and belief, NewLead Holdings US is the sole member of NewLead JMEG.

116.     Upon information and belief, NewLead Holdings US is a wholly owned subsidiary of NewLead Mojave Holdings LLC.

17582660.2

117.    Upon information and belief, NewLead Holdings is the sole member of NewLead Mojave Holdings LLC.

118.    The operation of NewLead JMEG, NewLead Holdings US, and NewLead Mojave Holding LLC is contingent on and intertwined with the operations of NewLead Holdings such that there is commonality of financial and strategic resources, directors and officers and, at all relevant times, NewLead Holdings used the assets of these entities for its own purpose.

119.    Upon information and belief, none of these entities was adequately capitalized apart from, perhaps, NewLead Holdings. NewLead JMEG was created by NewLead Holdings, Zolotas, and Berkowitz for the express purpose of fraudulently signing contracts for the sale of coal it never intended or was capable of delivering. This was done for the express purpose of inflating the stock price of NewLead Holdings. NewLead JMEG was a sham corporation, created solely as a means of perpetrating a fraud. It had no assets against which its creditors could recover. The fraudulent scheme was perpetrated to allow NewLead Holdings, Zolotas, and Berkowitz to benefit and then utilize the corporate form to frustrate relief against NewLead JMEG, a sham company.

120.    Upon information and belief, NewLead Holdings, Zolotas, and Berkowitz regularly move cash and other assets between NewLead Holdings and its subsidiaries in order to satisfy listing requirement with the NASDAQ through artificially inflating share prices for NewLead Holdings and to avoid creditors.

121.    Berkowitz is the alter ego of NewLead JMEG, NewLead Holdings, and its subsidiaries and/or vice versa. Berkowitz exercises complete domination and control over NewLead JMEG. Berkowitz used NewLead JMEG, which had been dissolved in November 2008, as a fraudulent shell company to induce TransAsia to enter into the CPA.

122.    Zolotas is the alter ego of NewLead JMEG, NewLead Holdings and its subsidiaries and/or vice versa. Zolotas is the CEO and exercises complete domination and control over NewLead Holdings and its subsidiaries, and, without limitation, complete domination and control with respect to the negotiations with TransAsia and the CPA.

17582660.2

123.    Zolotas and Berkowitz, both individually and as the alter egos of NewLead JMEG and NewLead Holdings, fraudulently induced TransAsia to enter into and perform the CPA by intentionally misrepresenting and knowingly omitting material facts for the purpose of inducing TransAsia to enter into the CPA.

124.    TransAsia reasonably relied on such representations and omissions in entering into and performing the CPA, and which misrepresentations caused Trans Asia's damages herein.

125.    For the foregoing reasons, the interests of justice require that this Court disregard the corporate form of NewLead JMEG and enter judgment against NewLead Holdings, Michael Zolotas and Jan Berkowitz, jointly and severally.

**WHEREFORE**, plaintiff respectfully demands as follows;

1.    Judgment upon the complaint against NewLead JMEG, NewLead Holdings, Michael Zolotas, and Jan Berkowitz.

2.    Damages pursuant to the CPA;

3.    Compensatory damages;

4.    Consequential damages;

5.    Punitive damages;

6.    Rescission of the CPA and a finding that the CPA was void ab initio.

7.    Attorney's fees as authorized by law;

8.    Trial by Jury on all issues so triable;

9.    A constructive trust of defendants NewLead JMEG, NewLead Holdings, Zolotas and Berkowitz's assets for the benefit of Plaintiff;

10.   And any and all other relief to which Plaintiff may be entitled.

17582660.2

11.     A finding that the defendants are joint and severally liable to TransAsia for its damages.

COZEN O'CONNOR

Dated: New York, New York
       November 6, 2013

By:_____

       Jill L. Mandell (jmandell@cozen.com)
       Eric D. Freed (pro hac vice pending)
       (efreed@cozen.com)
       Lezlie Madden (lmadden@cozen.com)
       Cozen O'Connor
       45 Broadway
       New York, NY 10006
       *Attorneys for Plaintiff*

17582660.2