# EXHIBIT B



## *NEWLEADJMEG*, LLC

## COAL PURCHASE AGREEMENT

| **Seller:** | **Buyer** |
|---|---|
| NewleadJMEG, LLC | Trans Asia Commodities Ltd. |
| 4000 S. Faber Drive Place, Suite 300 | 120 Bunns Lane, |
| Charleston, South Carolina 29405 | London NW7 2AS, United Kingdom |
| Attn:  Jan M. Berkowitz, CEO | Attn: Serge Turko |
| Tel.   843-323-4326 | +44 (7500) 902750 |
| Tel.   704-806-2922 | |
| Fax.  980-939-6222 | |
| Email:  jan@JMEG.NET | Email: Serge@TransAsiaCommodities.com |

Ref. #: 130606002

This Confirmation ("Confirmation") sets forth the binding agreement entered into between the Parties on the Trade Date set out below as to a transaction (this "Transaction") regarding the sale/purchase of Coal under the following terms:

| | |
|---|---|
| **Effective Date:** | June 21st, 2013 |
| **Contact:** | Jan M Berkowitz  Direct (Tel.) 704-806-2922 |
| **Product:** | Steam Coal meeting the Specifications herein. |
| **Term:** | July 2013-July 2014 |
| **Lay Days** | July 19 - 29, 2013 |
| **Metric Ton or Tonne:** | Means 2,204.6 pounds. |
| **Source:** | Steam Coal |
| **Quantity/Tons:** | 110,000 Metric Tons +/- 10% shipping tolerance in buyers option July 2013 as a trial then after buyer and seller agree to proceed with 110,000 Metric Tons +/- 10% buyers option per month August 2013 to July 2014 (Total 13 parcels, 1,410,000 +/- 10% buyers Option MT) |
| **Contract Price:** | The provisional unit price per metric ton FOB NOLA is set at USD 75.00. The provisional price is based on a Freight Rate - MM 98 NOLA, USA to |

Mundra, India at USD 31.00. In the event the actual freight rate is less than $31.00 (as evidenced by the charter party agreement) the final unit price will be adjusted accordingly to the benefit of the Seller. In the event the freight is higher than $31.00, the additional cost will be borne by the Buyer. A final reconciliation will be completed within 21 days after the B/L date and will be settled directly between both parties. This settlement will be outside of the framework of the Letter of Credit. This unit price is for the initial cargo which is to be reviewed after completion of the trial cargo.

**Delivery Point:** FOB Vessel at MM 98, NOLA, USA

**Sampling & Analysis:** Per the Terms and Conditions.

**Weights:** Draft survey at the Delivery Point.

**Billing & Payment:** (Seller Banking details) Seller option to change banking

Remit Letter of Credit to:
BNP PARIBAS (SUISSE) SA
Place de Hollande 2 – Box – CH-1211 Geneva 11
Telephone: +41(0)58 212 21 11 – Telefax +41 (0) 212 22 22
Telex: 412 100 – TVA 472 794
CCP: 12-1244-8 CB-SIG/EuroSIC: 8686
IBAN CH14 0868 6001 1300 8800 1
BIC: BPPBCHGGXXX

(Buyers Banking)

BNP Paribas (Suisse) SA – Geneva
Place de Hollande 2 – Box – CH-1211 Geneva 11
Telephone: +41(0)58 212 21 11 – Telefax +41 (0) 212 22 22
Telex: 412 100 – TVA 472 794
Account Number: 89972/1A

Buyer shall open or cause to be opened an irrevocable and confirmable documentary Letter of Credit ("LC") subject to UCP 600 opened by the bank (acceptable to Seller), and advised through a first class international bank acceptable to Seller's bank.

30 days prior to the 1st day of the Laycan the Buyer shall establish an irrevocable Letter of Credit in favour of the Seller for the amount of 110% of the value of the Shipment.

Confirmation cost shall be for the account of the party requiring confirmation to the LC. All issuing charges of LC are for Buyer's account. All banking charges, fees and costs outside issuing bank shall be paid by

 

the Seller. The LC shall be valid for minimum of twenty-one (21) Working Days from B/L date.

Payment for each shipment of coal shall be made in full, without any set off, in US Dollars on the basis of invoice value, by means of Telegraphic Transfer, quoting Seller's invoice number to the US dollar bank account nominated by the Seller within 10 days of receipt of email/fax copy of shipping documents specified below

**Notice of Readiness:** Per the Terms and Conditions.

**Turntime:** Twelve (12) hours after NOR is tendered and provided the Vessel is in all respects ready to load cargo.

**Daily Loading Rate:** Defined as **20,000 Metric Tons/day** at Delivery Point per WWD (Weather Working Day), SHINC (Sundays and Holidays Included), excluding non-working Super Holidays.

**Loading Agents:** Buyer and Seller to nominate their own agents at the loading port.

**Specifications:**

|  | As Received Specification | Reject |
| --- | --- | --- |
| Moisture (AR %) | 7.50% | >11.00% |
| Ash (Dry %) | 9.00% | >15.00% |
| Sulfur (Dry %) | 3.66% | > 4.00% |
| Volatile (Dry %) | 38.2% | > 45% |
| Gross Calorific Value (Kcal/kg) | 7,072 | < 6,900 |
| BTU (Dry %) | 3,506 | |
| FSI | 4.0 | |
| Hardgrove Index | 42 Min | |
| Hardgrove Moisture | 1.77% | |

**Quality Adjustments:** Calorific Value (GAR): If the Gross Calorific Value as received for the cargo is less than or greater than the Basis Specification the following will apply with fractions pro-rata:

Adjustment = (Actual CV GAR Kcal/kg) / 7071 GAR K cal/kg) * Contract Price

**Taxes:** The price of the Coal to be sold by the Seller to Buyer hereunder was determined by reference to the world market for similar quality coal at the time of sale. Buyer hereby represents that any of the Coal purchased hereunder from the Seller shall be ultimately used or consumed by non U.S. consumers. No Coal excise taxes or other taxes are due and none




are a component of the price paid by the Buyer.

**Documents:** SELLER shall provide the following documents to BUYER at the confirmation address via overnight courier.

(a) Seller's commercial invoice in quadruplicate showing the Invoice Value calculated on Certificate of Weight issued by Independent surveyor at load port and quality adjustment per; signed by or on behalf of the Seller
(b) One (1) full set of 3/3 original negotiable clean board Bill of Lading and 3 non-negotiable copies of Bills of Lading; marked ` clean on board ` and freight payable as per charter party.
(c) One (1) original and three (3) copies of the Certificate of Origin in Issued by chamber of commerce or relevant governmental authority
(d) One (1) original and three (3) copies of the Certificate of Sampling & Analysis issued by the Independent Surveyor at loadport;
(e) One (1) original and three (3) copies of the Certificate of Weight issued by the Independent Surveyor at loadport to be supplied as soon as available.

**Other:** Any charge, adjustment or other cost (including demurrage) attributable to Two Port Loading will be for the Buyer's account.

All notices, invoices and confirmations to the location listed on this Confirmation.

Please confirm that the foregoing correctly sets forth the terms of the agreement between you and us as to this Transaction by timely returning an executed copy of this letter by facsimile at the fax number specified on the Confirmation or by email. This Confirmation supersedes any broker confirmation concerning this Transaction.

This agreement is subject to the attached **NewleadJMEG, LLC Terms and Conditions FOB Vessel ("Terms and Conditions")** that are hereby incorporated into and made part of this Confirmation (the Confirmation and the Terms and Conditions are referred to as the "Contract") as essential Terms and Conditions hereof and which are in lieu of and replace any and all terms and conditions set forth in any documents issued by Buyer, including, without limitation, any purchase orders and any specifications. ANY ADDITIONAL, DIFFERENT, OR CONFLICTING TERMS AND CONDITIONS ON ANY SUCH DOCUMENTS ISSUED BY BUYER AT ANY TIME ARE HEREBY OBJECTED TO BY SELLER, SHALL BE WHOLLY INAPPLICABLE TO THIS CONTRACT AND SHALL NOT BE BINDING IN ANY WAY ON SELLER. In the event of a conflict between the Terms and Conditions attached and specific provisions set forth above, the specific provisions will control. These terms of sale are accepted by Buyer, if not otherwise accepted, by Buyer's purchase or taking delivery of the product from Seller.

|  | **SELLER** | **BUYER** |
|---|---|---|
|  | **NewleadJMEG, LLC** | **TransAsia Commodities Ltd.** |
| **By:** | [signature] Signed 06/21/2013 | **By:** [signature] |
| **Print:** | Jan M Berkowitz, CEO | **Print:** Serge Turko |
| **Title:** | CEO | **Title:** Director |
| **Date:** | June 21st, 2013 | **Date:** June 21st, 2013 |

**NewleadJMEG, LLC Terms and Conditions FOB Vessel**

**1.0 Obligations for Purchase and Sale of Coal.** Seller agrees to sell and deliver to Buyer, and Buyer agrees to purchase, accept and pay for from Seller, the amount of Coal as set forth on the Confirmation ("Contract Quantity") to be delivered at the Loading Port in approximate ratable amounts each calendar month over the Term.

**2.0 Scheduling.**

**(a) Fixation of Laydays.** Buyer to give Seller Forty Five (45) days notice of a firm ten (10) days Laycan spread. The Seller will accept or refuse within two working days thereafter.

**(b) Nomination.** The Buyer or their Agents will nominate the carrying Vessel at least fourteen (14) before the commencement of the firm Laycan. Upon nomination, Buyer or their agents will give the Vessel name, details and tonnage to be loaded. BUYER will give notice of the estimated time of arrival ("ETA") at the Loading Port fourteen (14) days prior to the expected ETA. Further notices will be given 7, 5, 2 and 1 day prior to Vessel ETA at Loading Port.

**3.0 Delivery.** Buyer or its Transporter shall furnish suitable Vessels for loading and delivery of the coal. Coal shall be delivered to Buyer FOB Vessel at the Loading Port and title to and risk of loss of the coal will pass to Buyer as the coal passes progressively over the rail of the Vessel. Seller warrants that at the time of delivery it will have title to the coal, and will deliver the coal to Buyer, free and clear of all liens, claims and encumbrances arising prior to the transfer of title to Buyer. Seller and Buyer shall each indemnify, defend and hold harmless the other Party from any claims arising from failure of title or loss of the coal while title to and risk of loss of the coal is vested in the indemnifying Party.

**(a) NOR (Notice of Readiness).** NOR shall be tendered at any time, twenty four (24) hours a day, seven (7) days a week, SSHINC.

> **(i) NOR before the commencement of Laycan.** For Vessels tendering NOR before the firm Laycan, Laytime will commence at the earlier of expiry of Turntime (Turntime starting at 00:01AM local time on the first day of Laycan) or when loading actually commences, in which case the actual time used will count.
>
> **(ii) During Laycan.** For Vessels tendering NOR within the agreed Laycan, Laytime will commence at the earlier of expiry of Turntime, or when loading actually commences, in which case the actual time used will count.
>
> **(iii) After Cancelling Day.** For Vessels tendering NOR after the Cancelling Day, Seller may (at its absolute discretion) by written notice to Buyer treat as a failure to take delivery, in which case the remedy shall be set out in Article 4.0, or arrange a later Vessel at a mutually agreed spread of Laycan, or load the current Vessel on a spot basis without any liability for Demurrage.




**(b) Vessel Demurrage and Despatch.** Seller shall be fully responsible for Vessel's Demurrage based on the Vessel Laytime statement. Laytime commencement shall be based on Article 3.0 (a), provided the Vessel is in all respects ready to load cargo. Laytime shall end upon completion of loading operations and final draft survey (if necessary). In case Vessel's holds are rejected, Free Pratique is not granted or customs clearance is not granted on Vessel's berthing, time not to count from time of rejection until Vessel is ready in all aspects to load.

Time **shall** count toward Laytime or time on Demurrage due to the Loading Port failing to load at the Cargo Handling Rate.

Time **shall not** count toward Laytime or time on Demurrage if:

    **(i)**    time spent waiting for an appropriate tide (where applicable); or

    **(ii)**    time spent opening and closing hatches (where applicable) at the commencement and completion of loading; or

    **(iii)**    due to breakdown, inefficiency or any other cause attributable or relating to the Vessel, including but not limited to her master, officers or crew or tugs or pilots, or to the owners or agent(s) of the Vessel; or

    **(iv)**    in handling ballast or slops other than concurrently with loading; or

    **(v)**    due to the Loading Port operator or Loading Port authority prohibiting or restricting loading; or

    **(vi)**    shifting from "anchor-up" at the point of anchorage to "all-fast" at the point of loading; or

    **(vii)**    Where berthing or loading of the Vessel is suspended due to bad weather, time shall not count toward Laytime unless the Vessel is already on Demurrage.

In the event that time used for loading cargo exceeds the Laytime Allowed, then Demurrage is due and payable by Seller to Buyer at the Demurrage Rate that is governed by Buyer's Charter Party. Buyer shall provide documentation of Demurrage Rate to Seller (upon request) upon nomination of the performing Vessel or any time thereafter. In the event that time used for loading is less than the Laytime Allowed, then Despatch is due and payable by Buyer to Seller. Any Demurrage or Despatch is to be settled and paid by latest thirty (30) days after completion of loading.

**(c) Partial Vessel Demurrage and Despatch.** Vessel Demurrage and Despatch calculated above shall use only the loading Laytime data that pertains to the Seller's parcel.



(i) all time used until the instruction is given to commence loading the first parcel on the Vessel shall be divided between all the parcels loaded at the same Loading Port, on a pro-rata basis of each of the parcel tonnages to the total tonnage loaded on board the Vessel;

(ii) all time used during the loading of any parcel shall be counted against that parcel;

(iii) all time used between loading of different parcels shall be divided between all the parcels loaded at the same Loading Port, on a pro-rata basis of each of the parcel tonnages to the total tonnage loaded on board the Vessel. Time used between the loading of parcels shall be deemed to be time from completion of the draft survey of the parcel just loaded to the time of commencement of loading of the following parcel;

(iv) where the relevant Cargo Handling Rate is determined by reference to a loading scale, the Vessel's total loaded Tons at the Loading Port shall be used to determine the applicable Cargo Handling Rate; and

(v) if the data that pertains only to the Seller's parcel is unavailable, the above calculation will be based on, the proportion of the coal delivered by Seller to the total tons loaded on the Vessel at the Loading Port.

**(d) Coal Availability at Seller's option.** For situations where the Seller's Shipment is not the only Coal to be loaded onto the Vessel and the Delivery Point is Pier 6,9,11, Seller will only be responsible for Vessel's Demurrage due to late arrival of Seller's Coal at Pier 6, 9, 11 if and to the extent such late arrival is the result of Seller's delay. In the event Norfolk and Southern Railroad fails or refuses to supply adequate rail cars to Seller for loading at the Seller's Source to meet a Vessel Load Date on the grounds that other supplier(s) being loaded in the same Vessel are not ready to load into railcars at the their applicable location(s), Seller shall not be liable for any Demurrage charges to Buyer. The supplier(s) whose Coal is not ready to load at the applicable location(s) will be responsible for the total Demurrage calculated as set forth in subsection (c) above. Upon Buyer's request, Seller shall provide Buyer with documentation verifying such situation.

**4.0 Failure to Deliver or Receive Coal.** The remedies set forth in (a) and (b) shall be the exclusive remedies for a Party's failure to deliver or receive Coal as set forth in this Contract.

**(a) Seller Failure to Deliver.** Unless excused by Force Majeure or Buyer's failure to perform, if Seller fails to deliver all or part of the Contract Quantity for the relevant delivery month in accordance with the applicable Transaction, Seller shall pay to Buyer, within five (5) Business Days of invoice receipt, an amount for each Ton of Coal of such deficiency equal to (A) the commercially reasonable market price at which Buyer is able, or absent an actual purchase at the time of Seller's breach, would be able to purchase or otherwise receive comparable supplies of Coal of comparable quality on an equivalent adjusted basis (FOB Loading Port) plus (i) direct costs reasonably incurred by Buyer in



purchasing such substitute Coal and (ii) additional transportation charges, if any, reasonably incurred by Buyer as a result of taking delivery of substitute Coal at a location other than FOB Loading Port ("Replacement Price") minus (B) the Contract Price agreed to for the Transaction; except that, if such difference is zero or negative, then neither Party shall have any obligation to make any deficiency payment to the other.

**(b) Buyer Failure to Accept Delivery.** Unless excused by Force Majeure or Seller's failure to perform, if Buyer fails to accept delivery of all or part of the Contract Quantity for the relevant delivery month in accordance with the applicable Transaction, Buyer shall pay to Seller, within five (5) Business Days of invoice receipt, an amount for each Ton of Coal of such deficiency equal to (A) the Contract Price agreed to for the Transaction plus any storage, transportation or other direct costs reasonably incurred by Seller in reselling the Coal minus (B) the commercially reasonable market price at which Seller is able, or absent an actual sale, would be able to sell or otherwise dispose of the Coal (FOB Loading Port) at the time of Buyer's breach, ("Sales Price"); except that, if such difference is zero or negative, then neither Party shall have any obligation to make any deficiency payment to the other.

**5.0 Shipment Weighing, Sampling and Analysis.** Shipments delivered into Vessels shall be weighed at Seller's expense by means of a certified batch weighing system, certified track scale or if not available by draft survey. The weights determined thereby (absent manifest error) will be the basis on which invoices will be rendered and payments made hereunder. Samples shall be taken on an "as-loaded" basis, and analyzed on an "as-received" and "dry" basis, and all sampling, sample preparation and analysis shall be performed in accordance with then current published applicable ASTM standards. An independent laboratory chosen by Seller ("Analysis Person") shall, at Seller's expense, perform a short proximate analysis on an "as-received" basis, which shall include total moisture, ash, Btu, sulfur and, other data as required by the Contract.

**6.0 Rejection, Quality Adjustments.** The Buyer may reject Coal that falls outside the specification of the coal set out above ie: Moisture (AR %)  >11.00% , Ash (Dry %) >15.00%, Sulfur (Dry %) > 4.00%, Volatile (Dry %) > 45% and Gross Calorific Value (GAR) < 6900 Kcal/kg

**7.0 Billing and Payment.** Seller shall provide Buyer with an invoice (which may be delivered electronically) after each Shipment of coal during the Term, setting forth, the Contract Price for the coal actually delivered to Buyer at each Loading Port and any quality adjustments owed by Buyer or Seller to the other pursuant to this Contract. Payment is due no later than three (3) days after receipt of a Party's invoice unless otherwise set forth in the Confirmation. The Party shall pay, by wire transfer in immediately available United States funds, the amount set forth on such invoice. If any Party fails to pay amounts under this Contract when due, in addition to the rights and remedies provided in this Contract, the aggrieved Party shall have the right to: (i) suspend performance under this Contract until such amounts plus interest at the Interest Rate have been paid, and/or (ii) exercise any remedy available at law or in equity to enforce payment of such amount plus interest at the Interest Rate. The "Interest Rate" means, for any date, two percent over the per annum rate of interest equal to the prime lending rate as may from time to time be published in the *Wall Street Journal* under



"Money Rates:" provided the Interest Rate shall never exceed the maximum rate allowed by applicable law.

**8.0 Force Majeure.** If a Party is prevented from performing, in whole or in part, any of its obligations to deliver or receive coal at the Loading Port due to causes that are beyond the reasonable control and without the fault or negligence of the Party affected thereby (such causes being referred to herein as "Force Majeure"), and such Party gives oral notice and full details of the Force Majeure to the other Party as soon as reasonably practicable after the occurrence of the Force Majeure (such notice to be confirmed in writing), then during the period for which such Party's performance is prevented by such Force Majeure but for no longer period, the obligations of the Parties under such this Contract (other than obligations to make payments whether then due or due thereafter) shall be excused to the extent performance is so prevented. The Party affected by the Force Majeure shall remedy the Force Majeure with all reasonable dispatch and will keep the other Party advised as to of its efforts to remedy the Force Majeure; provided however, that this provision shall not require Seller to deliver, or Buyer to receive, the coal at points other than the Loading Port. In the event of a Force Majeure, delivery of the affected quantity of coal shall not be made up except by mutual agreement of the Parties. If an event of complete or partial Force Majeure persists for a continuous period of one hundred eighty (180) days, then the Party not claiming Force Majeure shall have the option, upon three (3) days' prior written notice, to terminate the affected Transaction to the extent affected and the associated obligations of the Parties thereunder (other than payment obligations for prior performance thereunder). A change in market conditions (including the ability of Seller to sell coal at a higher price or Buyer or Buyer's customer to buy coal at a lower price), Buyer's inability to economically use or resell the coal, whether or not foreseeable shall not be considered Force Majeure events. Seller's obligation under this agreement to provide coal is contingent on all necessary permits (federal and state) either being maintained for those currently in place or being obtained for those necessary for future mining production. The failure of the forgoing condition for any reason other than gross negligence or willful misconduct of Seller shall be considered a Force Majeure event.

**9.0 Warranty, Other Limitations.** OTHER THAN THOSE EXPRESSLY PROVIDED IN THE CONFIRMATION, SELLER MAKES NO OTHER REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, EXPRESS OR IMPLIED, IN CONNECTION WITH THE SALE AND PURCHASE OF COAL HEREUNDER. ALL WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM A COURSE OF DEALING OR USAGE OF TRADE ARE SPECIFICALLY EXCLUDED. Seller MAKES NO WARRANTY CONCERNING THE SUITABILITY OF COAL DELIVERED HEREUNDER FOR USE IN ANY FACILITIES. PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS CONTRACT SATISFY THE ESSENTIAL PURPOSES HEREOF. FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS HEREIN PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE LIABLE PARTY'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED UNLESS OTHERWISE PROVIDED IN THIS CONTRACT. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY HEREIN



PROVIDED, THE LIABLE PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. NOTWITHSTANDING ANY OTHER PROVISION IN THIS CONTRACT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS, OR BUSINESS INTERRUPTION DAMAGES, WHETHER BY STATUTE, IN TORT OR IN CONTRACT, UNDER THIS CONTRACT, ANY INDEMNITY PROVISION OR OTHERWISE.

**10.0 Successors and Assigns; Assignment.** This Contract shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. However, no Party shall assign this Contract or any of its rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, any Party may, without the need for consent from the other Parties (and without relieving itself from liability hereunder), (a) transfer, sell, pledge, encumber or assign this Contract or the accounts, revenues or proceeds hereof or thereof in connection with any financing or other financial arrangements; (b) transfer or assign this Contract to an Affiliate of such Party as long as the Affiliate is at least as creditworthy as the assignor; or (c) transfer or assign this Contract to any Person succeeding to all or substantially all of the assets of such Party by way of merger, reorganization or otherwise; provided, however, that no such assignment shall in any way relieve the assignor from liability for full performance under this Contract. Any such assignee shall assume and agree to be bound by the terms and conditions of this Contract.

**11.0 Bankruptcy.** The Parties agree that the Contract shall constitute a "forward contract", and that the Parties shall constitute "forward contract merchants" within the meaning of the United States Bankruptcy Code. Should either Party become subject to a Bankruptcy Proceeding, the other party may terminate the Contract (in whole or in part) by giving written notice. The foregoing remedy of either Party shall be cumulative and be in addition to any other remedies provided herein.

**12.0 Governing Law.** THIS CONTRACT AND THE RIGHTS AND DUTIES OF THE PARTIES ARISING HEREFROM SHALL BE GOVERNED BY AND CONSTRUED, ENFORCED AND PERFORMED IN ACCORDANCE WITH THE LAWS OF THE STATE OF North Carolina WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAWS. ANY DISPUTES ARISING OUT OF RELATING TO THIS CONTRACT SHALL BE RESOLVED BY A JUDGE TRIAL WITHOUT A JURY AND THE RIGHT TO A JURY TRIAL IS WAIVED, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW. EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY, NEW YORK.

**13.0 Confidentiality.** No Party shall disclose, without the prior written consent of the other Party, the terms of this Contract to a third party (other than a Party's and its Affiliates' employees, lenders, counsel, accountants, lessors, landowners or prospective permitted purchasers, directly or indirectly, of a Party or all or substantially all of a Party's assets or of any rights under this Contract, in each case who have agreed to keep such terms confidential) except in order to comply with any applicable law, order, regulation or exchange rule; provided, each Party shall notify the other Party of any proceeding of



which it is aware which may result in disclosure and make Commercially Reasonable Efforts to prevent or limit the disclosure.

**14.0 Definitions.** The terms defined herein and elsewhere in this Contract will have the meanings therein specified for the purpose of this Contract.

**"Affiliate"** means, with respect to any Person, any other Person (other than an individual) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person. For this purpose, *"control"* means the direct or indirect ownership of fifty percent (50%) or more of the outstanding capital stock or other equity interests having ordinary voting power.

**"ASTM"** means the American Society for Testing and Materials.

**"Bankruptcy Proceeding"** means with respect to a Party or entity, such Party or entity (a) makes an assignment or any general arrangement for the benefit of creditors, (b) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy or similar law for the protection of creditors, (c) has such a petition filed against it and such petition is not withdrawn or dismissed within thirty (30) days after such filing, (d) otherwise becomes bankrupt or insolvent (however evidenced), or (e) is unable to pay its debts as they fall due.

**"Buyer"** means the Party to a Transaction who is obligated to purchase and receive, or cause to be received, Coal during the Term of the Transaction.

**"Cancelling Day"** means the last day of the spread of Laycan.

**"Cargo Handling Rate"** means tons loaded/unloaded per day at the Port per WWD (Weather Working Day), SSHINC (Saturdays, Sundays and Working Holidays Included), excluding non-working Super Holidays or as specified in the Confirmation.

**"Coal"** means any and all of the coal to be sold by Seller and purchased by Buyer, the quality of which conforms to the Specifications, and which contains no synthetic fuels, is substantially free from any extraneous materials (including, but not limited to mining debris, bone, slate, iron, steel, petroleum coke, earth, rock, pyrite, wood or blasting wire), is substantially consistent in quality throughout a Shipment, meets the size required, and has had no intermediate sizes (including fines) added or removed.

**"Confirmation"** means a written confirmation memorializing the Transaction.

**"Contract Price"** means the price in $U.S. per Ton to be paid by Buyer to Seller for the purchase of Coal and any other proper charges pursuant to a Transaction.

**"Daily Loading Rate"** means **"Cargo Handling Rate"**.

**"Delivery Point"** means the **"Loading Port"**.

**"Demurrage"** means the financial compensation payable to the Party if the actual time used for loading is greater than the Laytime Allowed.

**"Demurrage Rate"** means the rate as set forth in the Confirmation, or if not so set forth, the rate that is equal to the demurrage rate set forth in Seller's charter party; in such case Seller shall provide documentation of Demurrage Rate to Buyer upon Vessel nomination.



**"Despatch"** means the financial compensation payable to the Party if the actual time used for loading is less than the Laytime Allowed and being 50% of the Demurrage Rate.

**"FOB"** shall have the meaning given to such term in the Uniform Commercial Code of the State of New York.

**"Free Pratique"** means the relevant authorities' being satisfied as to the state of health of theses on board the Vessel.

**"Laycan"** means the time period during which the Vessel must arrive at the Loading Port for the commencement of loading.

**"Laytime"** means the time used for loading the Vessel at the Loading Port as determined in accordance with 3.0.

**"Laytime Allowed"** is calculated as (Vessel Tonnage ÷ Daily Loading Rate) = Laytime Allowed.

**"Loading Port"** means the agreed port of delivery and receipt of the Coal pursuant to a Transaction. Title to and risk of loss of the Coal shall pass to Buyer.

**"NOR"** means the notice of readiness tendered at the Loading Port by the master of the Vessel.

**"Party"** shall mean either Buyer or Seller as indicated by the context, and "Parties" shall mean Buyer and Seller

**"Person"** means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

**"Seller"** means the Party to a Transaction who is obligated to sell and deliver or cause to be delivered Coal during the Term of the Transaction.

**"Shipment"** means, as applicable, one Unit Train load, one Barge or Vessel load, or the aggregate of the truckloads that are loaded on anyone day in accordance with the applicable Transportation Specifications.

**"Source"** means the mine(s), mining complexes, loadout, river dock(s) or other point(s) of origin that Seller and Buyer agree are acceptable origins for the Coal.

**"Specifications"** means the quality characteristics for the Coal subject to a Transaction on an "as received" basis, using ASTM standards.

**"SSHINC"** means Saturdays, Sundays and working Holidays included.

**"Super Holidays"** means New Year's Day, Thanksgiving and Christmas.

**"Term"** means the period of time from the date a Transaction is to commence to the date a Transaction is to terminate or expire.

**"Metric Ton"** means 2,204.6 pounds.

**"Transaction"** means a particular transaction agreed to by the Parties relating to the purchase, sale or exchange(s) of Coal, or an Option relating thereto, subject to this

Contract.

***"Transportation Specifications"*** means the agreement(s) made by Seller, Buyer or any Party's designee with its respective Transporter(s), as amended from time to time, covering the requirements for each Shipment, which agreements, including the timing and tonnage requirements thereunder, shall be no more restrictive than typical agreements for transport of Coal on rail lines, highways, Vessels or barges transporting Coal to or from the Loading Port(s) for third parties or to and from other delivery points in the vicinity of the Loading Port. Such Transportation Specifications, or relevant portions therein, shall be made available upon request to the extent authorized within the relevant transportation agreement and shall be no more restrictive than typical agreements for transport of Coal on rail lines, highways, Vessels or barges transporting Coal to or from Loading Port(s) for third parties or to and from other delivery points in the vicinity of the Loading Port.

***"Transporter"*** means the entity or entities transporting Coal on behalf of Seller to and at the Loading Port or on behalf of Buyer or Buyer's designee from the Loading Port.

***"Turntime"*** means the grace period before Laytime starts. Turntime will be 12 hours after NOR is tendered and accepted, or as specified in the Confirmation.

***"Vessel"*** means the Party's vessel on which the Shipment is loaded.

***"WWD"*** means Weather Working Days, being Working Days at the Loading Port on which it is possible to load a Vessel without being hindered by bad weather.