# EXHIBIT C

**From:** Chris Palmer [mailto:Chris.Palmer@clarksons.com]
**Sent:** 18 July 2013 15:51
**To:** Serge Turko - TransAsia Commodities
**Subject:** MV UBC OTTAWA/ TRANSASIA - FINAL CLEAN RECAP (17/07/13)

SERGE/CHRIS

(W/ ITIN + BANKING DETAILS ADDED)

PLSD TO RECAP HAVING CONCLUDED THE FLWG FIXTURE WITH C/P DATED 17 JULY 2013 :

============================================================
ALL NEGOTIATIONS + EVENTUAL FIXTURE TO BE KEPT PRIVATE AND CONFIDENTIAL
============================================================

TONNAGE:

MV UBC OTTAWA – DESCRIPTION AS ATTACHED

EXPECTED INTAKE: abt 105K bss 47 feet draft (wog - sub masters reconfirmation)

ITINERARY: Etc / s Hamburg 3 August ETA NOLA 23 Aug

THE FOLLOWING WORDING ONLY TO APPLY PROVIDED THAT THE CARGO IS FULLY READY IN ALL OTHER RESPECTS TO BE
LOADED/DISCHARGED:
OWNERS/VESSEL/MASTER TO COMPLY WITH ALL RULES, REGULATIONS AND REQUIREMENTS, AND TO SATISFY
THEMSELVES AS TO ALL DRAFTS AND OTHER RESTRICTIONS AT ANY PORT / TERMINAL / BERTHS / ANCHORAGES /
FACILITIES / APPLIANCES. SUCH RULES, REGULATIONS AND REQUIREMENTS ARE TO BE FULLY INCORPORATED INTO THIS
CHARTER PARTY FOR THEIR FULL TERMS AND EFFECT AND ANY TIME LOST AS A RESULT OF OWNERS/VESSEL/MASTER
FAILURE TO SO COMPLY OR TO SO SATISFY SHALL NOT COUNT AS LAYTIME OR TIME ON DEMURRAGE.

OWNERS GTEE THAT THE VESSEL IS INSURED BY A MEMBER OF THE INTERNATIONAL GROUP OF P&I CLUBS

OWNERS GTEE THAT THE VESSEL IS CLASSED LLOYDS 100A1 OR EQUIVALENT BY A MEMBER OF THE INTERNATIONAL
ASSOCIATION OF CLASSIFICATION SOCIETIES (IACS)

OWNERS FULL STYLE: BELNETO CONATINER CHARTERING & LOGISTIC LTD

OWNERS BANK DETAILS: as attached

=

ACCOUNT + INVOICE ADRESS:

TRANSASIA COMMODITIES LTD

120 BUNNS LANE
LONDON NW7 2AS
UNITED KINGDOM

110,000/10 MT MOLOO COAL

LOAD      - ASSOCIATED TERMINAL MIDSTREAM -- NEW ORLEANS

DISCHARGE -- MUNDRA
        PLUS ALTERNATIVE DISCHPORT CLAUSE AS BELOW

LAYCAN   - 23 AUGUST -- 1 SEPTEMBER (00:01HRS LT/23:59HRS LT) 2013

LOADRATE - 20,000 MT PER WWD OF 24 CONSECUTIVE HOURS SHINC

DISCHARGE -
MUNDRA - 30,000 MT PER WWD OF 24 CONSECUTIVE HOURS SHINC

12 HOURS TURNTIME UNLESS SOONER COMMENCED WHICH CASE ACTUAL TIME USED TO COUNT BOTH ENDS

FREIGHT - US$34.30 PER METRIC TON FIO BSS MUNDRA 1:1

DEMURRAGE: US$19,300 DHDLSTBE

FREIGHT PAYMENT -- THE BILLS OF LADING WILL SHOW FREIGHT PREPAID OR FREIGHT AS PER C/P.  FREIGHT WILL BE
PAYED IN FULL UPON PRESENTATION OF INVOICE AND COPY OF BILL OF LADING WITHIN  5 BANKING DAYS AFTER B/L
DATE.  100% FREIGHT TO BE RECIEVED PRIOR RELEASING THE BILLS OF LADING.

CHARTERERS AGENTS BOTH ENDS:

USG:
Trent Blanchard
----------------
Gulf Inland Marine Services, Inc
2341 South Darla Street
Gonzales, LA 70737
Tel (225) 647-2770
Fax (225) 647-2778
Email operations@gulfinland.com

MUNDRA:
Ben Line
Ram Gopal Mishra
Ben Line Agencies India Private Limited - As Agents only
Office:+91 2836 228996| Direct:+91 2836 650171| Mobile:+91 9979435388
www.benlineagencies.com

CHARTERERS TO HAVE THE OPTION TO DISCHARGE AT AN ALTERNATIVE AND/OR ADDITIONAL SAFE BERTH, SAFE PORT
OR SAFE ANCHORAGE WITHIN THE WCI / H.KONG RANGE OTHER THAN THOSE SPECIFICALLY NAMED IN THIS CHARTER
PARTY, IN WHICH CASE THE FREIGHT RATE TO REFLECT THE SAME TIME CHARTER RETURN AS MUNDRA DISCHARGE.

2

CALCULATIONS ON OPEN BOOK BASIS - ANY DIFFERENCES TO BE SETTLED PRIOR COMMENCMENT OF DISCHARGING

1.25% ADCOM ON FREIGHT/DEAD FREIGHT / DEMURRAGE + 1.25% BROKERAGE CLARKSONS

OTHERWISE AS PER ATTACHED CP WITH LOGICAL AMMENDMENTS + BELOW ALTERATIONS:
- Lines 50 – 58 to be re-instated
- Line 63 –last line replace "commencement of loading." with "expiry of turn-time."
- Line 78 – end of line, replace "berth" with "port"
- Clause 8A, add to last line: "The cost incurred for vessel hire and fuel consumed during such waiting time shall be shared equally at the rate of demurrage agreed."
- Lines 117-120 – deleted part to be re-instated.
- Line 121 Demurrage/Despatch - Add: Demurrage, if incurred for more than 10 days at port of loading or discharge shall be paid in 10 days intervals upon receipt of owners' invoice. Any balance to be settled within 15 days of completion of discharge, together with dispatch, if any.
- Line 135 – delete "equally shared between the Owners and" – to read "for Charterers"
- Line 148 – delete 2nd sentence
- Between lines 152 and 153 "DRAFT SURVEY" clause, add: The independent surveyor shall be mutually appointed priot to vessel's arrival at load port.
- Line 162 delete the word "not"
- Para between lines 163 and 164 – Add to last line: Any reduction in vessel's intake because of draft restrictions at discharge port to be compensated to owners with dead-freight
- Clause 18.  Extra insurance on Cargo –s ince Charterers fixed a named vessel, such additional insurance cost shall be declared by Charterers prior to final fixture confirmation of cp details
- Clause 19. Lines 174-176 (b) to be re-instated
- Lines 195-196 – 2nd inserted para, 2nd line read:  ...to any other port within India-H.Kong range under the terms of the Charter Party (subject to Clauses 40./41).
- Line 197 b) Extra Insurance  - line 3 delete from "and same not to exceed that applicable on London market for similar vessels"
- Insurance (referring to P&I) delete "first class" in line 2. Club is SKULD, Oslo, a well established Club with a high reputation
- Clause 24 -  please advise/confirm which B/L form Charterers wish to have issued. Owners prefer the BIMCO Congen form - reverting
- Clause 27 – read  headline (BIMCO CODE NAME: Voywar 1993)
- Clause 36 – for clarification: War Risk Zones include Piracy Risk Zones

END

MANY THANKS TO BOTH PARTIES AND TRUST ABOVE IS IN LINE WITH YOUR NOTES

FOR ALL OPS EMAILS PLS LIAISE WITH PANAMAXOPS@CLARKSONS.COM


+

RGDS

==========================
CHRIS PALMER
PANAMAX -GENEVA
DIRECT: +41 22 308 9924
MOBILE: +41 79 861 9924
MSN: palmerce@hotmail.co.uk
==========================

This message is private and confidential. If you have received it in error, you are on notice of its status. Please notify us immediately by reply email and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person: to do so could be a breach of confidence.

Emails may be monitored.

Details of Clarkson group companies and their regulators (where applicable) can be found at this url: Disclosure

separator sheet

BANK NAME:        NORD/LB

BANK ADDRESS:     FRIEDRICHSWALL 10
                  30151 HANNOVER
                  GERMANY

BANK BIC:         NOLADE2H

BENEFICIARY:      BELNETO CONTAINER CHARTERER. & LOGISTIC LTD

IBAN:             **DE47 2505 0000 1800 7338 26**

INTERMEDIARY BANK

BANK NAME:        JP MORGAN CHASE, NY USA

ACC. NO.:         0011337268

separator sheet

DESCRIBTION MV UBC OTTAWA
MV UBC OTTAWA        - 118,625 MT DWT – DUTCH FLAG - DELIVERED JUNE 7

SISTER VESSELS:
MV UBC OHIO         - 118,532 MT DWT - DUTCH FLAG - DELIVERED APRIL 18TH, 2011
MV UBC ONSAN        - 118,590 MT DWT - DUTCH FLAG - DELIVERED JULY 15TH, 2011
MV UBC ORISTANO     - 118,467 MT DWT - GIBRALTAR FLAG  - DELIVERED AUGUST 24TH, 2011
MV UBC OLIMBUS      - 118,471 MT DWT - GIBRALTAR FLAG - DELIVERED OCTOBER 15TH, 2011
MV UBC ODESSA       - 118,339 MT DWT - DUTCH FLAG - DELIVERED DEC 17TH 2011

118,500 MT DWT (SEE DWT ABOVE) ON 14.5 M SSW
BUILT 2011 DAYANG SHIPYARD

THE VESSEL IS A SINGLE SCREW DIESEL ENGINE DRIVEN BULK CARRIER OF B-60 TYPE, EQUIPPED WITH
MEWIS DUCT, SUITABLE FOR OCEAN GOING CARRYING DRY BULK INCLUDING GRAIN, COAL, IRON ORE.

SEVEN (7) CARGO HOLDS ARE ARRANGED.  CARGO HOLDS AREA IS CONSTRUCTED AS SINGLE SKIN WITH
TOPSIDE TANKS, HOPPER TANKS ARE DOUBLE BOTTOM.

TANK TOP DESIGNED FOR DISCHARGE FOR HEAVY GRABS.
OPTIMIZED HULL AND PROPELLER DESIGN.

VESSEL IS EQUIPPED WITH BALLAST WATER TREATMENT SYSTEM.

HEAVY FUEL OIL STORAGE TANKS ARE SET UP IN WAY OF TOPSIDE OF NO.6 -
NO.7 CARGO HOLDS, AND OTHER FUEL OIL TANKS AND DIESEL OIL TANKS ARE ARRANGED IN ENGINE
ROOM WITH PROTECTION BY COFFERDAMS AT SHIPSIDE.

MAIN DIMENSIONS
LENGTH OA:          260.43M
LENGTH BP:          254.00M
BEAM:                43.00M
DEPTH:               20.25M
DESIGN DRAFT:        13.00M
SCANTLING DRAFT:     14.50M
TPC     104.6 M T

CAPACITIES
CARGO HOLD (GRAIN):      139,000M3
CARGO HOLD (BALE):       136,200M3
GROSS TONNAGE (ABOUT):    65,957
NET TONNAGE (ABOUT):      38,906

HEAVY FUEL OIL TANK (100%):   4,160M3
DIESEL OIL TANK (100%):        400M3
BUNKER CAPACITY AT 85% FILLING: HFO 3285 MT / LSDO 109 M T / MDO 73 MT.

FRESH WATER TANK:           460M3
DISTILLED WATER TANK:        50M3
BALLAST WATER:           59,000M3

| HATCH DIM | HOLD CAPACITY GRAIN/BALE CUM: |
|---|---|
| H1 18.9 X 17.0 M | H1 14755.4 / 14460.3 |
| H2 18.9 X 20.4 M | H2 21579.3 / 21147.7 |
| H3 18.9 X 20.4 M | H3 21654.9 / 21221.8 |
| H4 18.9 X 20.4 M | H4 19623.9 / 19231.9 |
| H5 18.9 X 20.4 M | H5 21654.9 / 21221.8 |
| H6 18.9 X 20.4 M | H6 21654.9 / 21221.8 |
| H7 18.9 X 20.4 M | H7 18081.9 / 17720.3 |
| | HOLDS 2, 4 AND 6 MAY BE EMPTY |

**ALTERNATE LOADING**
vessels are suitable for alternate hold loading: 1,3,5,7 laden and 2,4,6 empty.
Any alternate hold loading/separation request is subject to Master's approval.


**CARGO EQUIPMENT**
HATCH COVERS2
SIDE ROLLING TYPE, HYDRAULIC OPERATED WITH FOLLOWING OPENING SIZE FOR
HATCHES:
NO.1:            18.90M X 17.00M
NO.2-7:          18.90M X 20.40M

**LOAD CARGO HOLD TANK TOP**
ALLOWED UNIFORM LOAD OF CARGO HOLD TANK TOP
NO.1, 3, 5, 7:          27T/M2
NO.2, 4, 6:             18T/M2
MAXIMUM LOCAL LOAD OF CARGO HOLD TANK TOP
NO.1, 3, 5, 7:          30T/M2
NO.2, 6:                20T/M2
NO.4:                   25T/M2

**DECK MACHINERY**
WINDLASS
2 SETS, ELECTRO-HYDRAULIC
MOORING WINCHES
6 SETS X 20T X 15M/MIN, ELECTRO-HYDRAULIC LIVESAVING APPLIANCES
1 SET, 28 PERSONS, FREEFALL TYPE LIFEBOAT, WITH A LAUNCHING/RECOVER DEVICE
1 SET, 6 PERSONS RESCUE BOAT
PROVISION/EQUIPMENT HANDLING CRANE
1 SET X 2T, ELECTRO-HYDRAULIC TYPE
1 SET X 4T, ELECTRO-HYDRAULIC TYPE

**ACCOMMODATION**
ACCOMMODATION FOR 27 PERSON

**FLAG / CLASSIFICATION**
REGISTERED UNDER THE FLAG OF NETHERLAND RESPECTIVELY GIBRALTAR
GL 100 A5 BULK CARRIER, ESP, CSR, BC-A,
GRAB (30)T IW, EP GL MC AUT
MACHINERY MAIN ENGINE (TIER II) MAN B & W 6S60MC-C MARK 7 X 1 SET
SMCR            13,560KW AT 105.0R/MIN KNOTS
CSR             12,204KW AT 101.4R/MIN KNOTS

**MAIN ENGINE GENERATORS**
DOOSAN/MAN L 23/30H: 3SETS X 730 KWE
(450V, 60HZ, 720/MIN, 3 PHASE, 3 WIRE)
FUEL UP TO IFO 700 CST AT 60°C
EMERGENCY DIESEL GENERATOR
1 SET X ABOUT 150. KWE
(450V, 60HZ, 1800R/MIN, 3 PHASE, 3 WIRE) PROPELLER/MEWIS DUCT ONE (1) SET, 4 BLADES, FIXED
PITCH, KEYLESS, AEROFOIL SECTION STEAM GENERATING PLANT
1 SET X COMPOSITE BOILER
EVAPORATION ON OIL FIRE SECTION:    1800KG/H
EVAPORATION ON EXH. GAS SECTION:    1400KG/H

**BALLAST PUMP**
2 X SETS X 2200M3/H AT 0.27MPA

**STEERING GEAR**
ELECTRIC HYDRAULIC STEERING GEAR OF ROTARY TYPE BALLAST WATER TREATMENT NEI TREATMENT
SYSTEM FUEL CONSUMPTION (IF IN USE) 500KG/H ISO 8217 DMA/DMB.

ALL DETAILS 'ABOUT' SINCE MINIMAL DIFFERENCES EXIST BETWEEN VESSELS - SEE DWAT,
LOA (FEW CENTIMETRES) ETC.

## VARIOUS MEASUREMENTS

DISTANCE FROM BRIDGE TO BOW. ~ 224.5 MTRS

DISTANCE FROM BOW TO FORWARD PART OF NO.1 HATCH. ~ 18.0 MTRS

DISTANCE FROM STERN TO ACCOMMODATION GANGWAY. ~24.0 MTRS

TOTAL DISTANCE FROM FWD NO.1 HATCH TO AFT NO. 7 OR LAST HATCH. ~ 204.0MTRS


## DISTANCES WATERLINE TO HATCH COAMING

A) DISTANCE WLTHC IN MINIMUM BALLAST CONDITION. ALL BALLAST TANK ARE FULL.
    F - 6.27M        A - 7.89M
    HOLD # 1: 17.14 M,  H # 4: 16.33 M,  H # 7: 15.52 M


B) DISTANCE WLTHC IN FULL BALLAST CONDITION. HOLD NO.4 IS FULL.
    F - 8.5M        A - 8.9M
    H # 1: 14.9 M,  H # 4: 14.66 M,  H # 7: 14.44 M


C) DISTANCE WLTHC IN HEAVY BALLAST CONDITION (INCLUDING HOLDS FLOODED)
    F - 11.05M        A - 11.34M
    HOLD # 4: (FULL) HOLD # 2: (8.3 MTRS) & HOLD # 6: (10 MTRS) FOR PORT CONDITION ONLY.
    H # 1: 12.36 M,  H # 4: 12.21 M,  H # 7: 12.06M


D) HOLD # 4 (FULL BALLAST) ALLOWED TO BE FLOODED FOR SEA GOING CONDITION.
    HOLDS NO. 2 & 6 UP TO 10 MTRS ALLOWED TO BE FLOODED BUT FOR PORT CONDITION ONLY.


**The distance from waterline to the highest point of the vessel**

A) Air draft full Loaded SW = 36.70 mtrs

            FW = 36.367 mtrs


B) Air draft normal Ballast SW = 42.37 mtrs  ( 85% FO,DO, LO, FW )

            FW = 42.04 mtrs  --- do ---

        heavy  Ballast SW = 40.91 mtrs  ---  do --- ( CH4 Ballasted )

            FW = 40.58 mtrs  ----------- do -------------


**ALL DETAILS GIVEN IN GOOD FAITH AND TO THE BEST OF OUR KNOWLEDGE, BUT WITHOUT GUARANTEE.**

separator sheet

Code Name: **"AMWELSH 93"**
Recommended by
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)



# AMERICANIZED WELSH COAL CHARTER

*Issued by the Association of Ship Brokers and Agents (U.S.A), Inc.*
New York - 1953; Amended 1979; Revised 1993

| | |
|---|---|
| **THIS CHARTER PARTY**, made and concluded in .............................................................................. | 1 |
| this ......................................... day of 1 ........................................................ ~~19~~ *2013* ................... | 2 |
| Between ....................................................................................................................................... | 3 |
| ....................................................................................................................................................... | 4 |
| *Time Chartered* **Owners** of the ........................... (flag) Vessel ..................................................... | 5 |
| of *See Clause 1A* .......................... built .............................. (year) at ...................................... (where) | 6 |
| of .......................... tons of 1000 kilos total deadweight on summer freeboard, inclusive of bunkers, | 7 |
| classed .......................................................in ......................................................... and registered | 8 |
| at ........................................ under No.................................................... The Vessel's length overall is | 9 |
| ........................................................ beam is ........................................... The Vessel's fully laden draft on summer | 10 |
| freeboard is ....................................... now *trading* .......................................................................... and | 11 |
| J. ....................................................................................................................... ... | 12 |
| *as* **Charterer** ........................................................................................................................... | |
| ~~of the City of~~ ......................................................................................................................... | 13 |

## 1.   Leading Port(s)/Discharging Port(s)                                                14

That the said Vessel being tight, staunch and strong, and in every way fit for the voyage, shall, with all     15
convenient speed, proceed to                                                                                    16
.......................................................................................................................................................  17
.......................................................................................................................................................  18
............................................................................... and there load, always afloat, and in the         19
customary manner from the Charterer, in such safe berth as it shall direct, a full and complete cargo          20
of Coal        *metric..* tons ~~of 2240 lbs/1000 kilos*~~ ............*10* % more or less in the Owner's       21
option, *(subject to port loading / discharging restrictions)*; and being so loaded, shall therefrom proceed, with all  22
convenient *speed* to                                                          ', *plus alternative discharge port(s)*
*wording to apply ~ as per Clause 35,* or so near thereunto as                                                  23
she can safely get, and there deliver her cargo, as ordered
by the Charterer, where she can safely deliver it, always afloat, on having been paid freight at the rate of    24
U.S. $              :                      ) per metric ton free in / out spout / grab trimmed of ~~2240 lbs~~/1000 kilos*  25
on bill of lading quantity *basis*            discharge.

*All cargo grades to be loaded within vessel's natural segregations. Charterer to have the option to load up to 4 grades.*  26
*However, no reduction in cargo intake due to segregation.*

*No additional cargo / part cargo allowed.*

~~*) Delete as appropriate~~

*EXPECTED INTAKE:*
*ABOUT .*                (

*ITINERARY:*
*ETA*                .        ..

*Owner / vessel / Master to comply with all rules, regulations and requirements, and to satisfy themselves as to all drafts and other restrictions at any port / terminal / berths / anchorages / facilities / appliances. Such rules, regulations and requirements are to be fully incorporated into this Charter Party for their full terms and effect, and any time lost as a result of Owners' / vessel's / Master's failure to so comply or to so satisfy shall not count as laytime or time on demurrage.*

*Owners guarantee that the vessel is insured by a member of the International Group of P. and I. Clubs.*

*Owners guarantee that the vessel is Classed Lloyd's 100 A.1. or equivalent by a member of the International Association of Classification Societies (IACS).*

*a. VESSEL'S REQUIREMENTS:*
*Performing vessel to be modern, gearless, singledeck bulkcarrier with self-trimming holds Without obstacles and longitudinal bulkheads for Charterer's unloader to effect discharge and suitable for discharge by mechanical grabs and mechanical trimming. Owner will be liable for loss of time and any extra expenses incurred by reason of cargo not being accessible to mechanical grabs normally used for discharging and any extra discharging expenses over and above discharging tariff of a singledeck, self-trimming bulkcarrier.*

*b. PRESENTATION:*

*The vessel is to be presented for loading in such trim and proper conditions as to permit calculation of the vessel's light displacement. If requested by the Shippers or Charterer the vessel is to provide the following information: calibration scales for all tanks including fore and aft peak, double bottom tanks and deeptanks, capacity plans, displacement scales, deadweight scales and hydrostatic information all certified by Master as to correct at the time of loading. The load lines, load line mark and draft scales on both sides - fore, midships and aft are to be clearly cut and painted on the shell plating.*

*c. HOLD CLEANLINESS:*

*On arrival at load port the Owner warrants that the vessel shall have all cargo spaces, including undersides of hatchcovers clean and dry, free from scale and loose rust and suitable to receive the contract cargo. Vessel to be passed for cleanliness by an independent surveyor appointed by Charterer or Shippers. Owner warrants that all cargo spaces and hatchcovers will be accessible to the surveyor's inspection. Should the vessel fail the inspection, all time lost directly related to and all directly related expenses for cleaning to be for Owner's account. The published loading terminal rules to apply.*

*d. CLASSIFICATION:*

*Throughout the duration of this Charter the performing vessel to be classed Lloyd's 100 A.1. or equivalent. The Classification Societies have to be full members of AICS.*

*e. DEEPTANKS:*

*No cargo is to be loaded in deeptanks of similar places inaccessible to reach by grabs. Deeptanks, tunnels and all other divisions within the vessel's holds to be protected against damage by Receiver's grabs. Any extra expenses caused by open bilges to be for Owner's account.*

*f. BALLAST / DEBALLASTING:*

*Owner warrants that the vessel can ballast / deballast at port fast enough to comply with Charterer's, Shippers or Receivers' requirements including all rules, regulations and laws in force at the load/discharge port applicable to ballast / deballasting.*

*g. LIGHTS:*

*Vessel to provide all necessary light for night work as on board, free of expense to Charterer.*

*h. INTERNATIONAL MARITIME ORGANISATION:*

*The performing vessel shall comply with the then current International Maritime Organisation Regulations and recommendations applicable to the carriage of coal.*

*i. HULL AND MACHINERY:*

*Owner warrants that the performing vessel is fully covered and shall be maintained for Hull and Machinery Insurance with first class Underwriters throughout the duration of the Charter.*

| | | |
|---|---|---|
| **2.**   **Freight Payment** | | 27 |

The FREIGHT shall be paid in *U.S.$ Currency per metric ton on the Bill(s) of Lading quantity, free in and out*   28
*spout / grab trimmed. Owners shall furnish, if required, a declaration by the master that all cargo received on*   29
*board has been delivered.* ........................................................................................................................   30

*The freight is inclusive of all port charges, pilotages, consulates, agency fees and other fees customarily paid by the vessel.*

:                            *t calculated on Bill(s) of Lading weight to be paid within          banking days of signing/releasing Bill(s) of Lading marked "Freight payable as per Charter Party" to Charterer. Freight deemed earned as cargo loaded on board discountless and non returnable vessel and/or cargo lost or not lost. Freight payment always to be received before breaking bulk. .*

*ι*

*Freight payable to Owner's designated bank account as follows :*

**BENEFICIARY NAME :**

**BENEFICIARY A/C NO :**

**BANK NAME : .**

**SWIFT, ABA NO ETC :**

**ABA :**

*All such monies shall be paid U.S. Dollars by wire transfer of Federal funds to Owner's designated bank account. Charterer shall have no obligations to pay any funds to Owner to any other bank account, unless otherwise instructed by the Owners which case Charterer to pay as per Owner's revised bank instructions.*

*2a – Deleted.*

*2b – Deleted.*

*2c - DEADFREIGHT:*

*In the event of deadfreight, Owner warrants that the Master upon completion of loading shall issue a letter of protest fully substantiated and addressed to the Shippers and operators of the terminal in order to protect Charterer's interests and shall within 48 hours after completion of loading provide Charterer or its Agents with a deadfreight statement. Should Owner fail to comply, Charterer shall not pay for the deadfreight.*

**3.**   **Notices & Loading Port Orders**                                                                                               31

~~The Master shall give the Charterers (telegraphic address "..............................................................................",~~   32
~~Telex No ..................................., Fax No ...........................) and ......................... days notice of the date of the~~   33
~~Vessel's expected readiness to load, and approximate quantity of cargo required with the ...............................~~   34
~~day notice. The Charterers shall be kept advised by any form of telecommunication of any alterations in~~   35
~~that date, as and when known. The Charterers shall declare first or sole loading port on receipt of the~~   36
~~Master's ............................................................................................. day notice, unless declared earlier.~~   37

*If no separate notice terms have been agreed, the Master shall notify the load port Agents and Charterer immediately upon commencement of the voyage to the load port.  During vessel's voyage to the load port, Master shall give 10 / 5 / 4 / 3 / 2 / 1 day(s) notice to the load port Agents and Charterer of the vessel's estimated time of arrival at the load port.*

*If (per Clause 4 below) the intended discharge port(s) will place a restriction on the amount of cargo that can be discharged, thus restricting the vessel's intake, Charterer to notify Owner of maximum quantity of cargo acceptable at both loading and discharging port(s)/terminal(s) no later than 24 hours before arriving load port*

*Charterer to declare to Owner any additional discharge port (as permitted pursuant to Clause 35) no less than 5 days prior commencement of laydays.*

*If no separate notice terms have been agreed, immediately upon sailing from load port the Master shall notify the discharge port Agents and Charterer of the cargo quantity loaded and the vessel's estimated time of arrival at the discharge port(s).  The Master shall also give 14 / 10 / 5 / 4 / 3 / 2 / 1 day(s) notice to discharge port Agents and Charterer of the vessel's estimated time of arrival at discharge port(s).*

*If there will be any alteration of more than 12 hours of the estimated time of arrival at either the load port or discharge port(s) after the Master has given 10 days notice, the Master shall immediately notify both the Charterer and the load port or discharge port Agents as applicable.*

*Should any willful misrepresentation be made by either Owner or Master in respect of the position or condition of the vessel, Charterer shall have the option to cancel this Charter Party and Charterer to have the option to claim for damages.*

**4.    Discharging Port Orders**                                                                38

*Unless declared on fixing the* ~~The~~ Master shall apply to the Charterer by any form of telecommunication for      39
declaration of the first or

sole discharging port *latest 5 days prior to arrival of vessel at load port.* ~~96 hours before the Vessel is due off/at~~    40

..........................................................................................

*If the intended discharge port(s) will place a restriction on the amount of cargo that can be discharged, thus restricting*    41
*the vessel's intake, the Charterer is to declare the same to the Master not later than 48 working hours before the vessel's*
*arrival at the load port. In the event of such declaration by the Charterer, Owner shall not be held responsible for later*
*cargo requirement declaration by Charterer, and Owner to be compensated to the extent that the restriction in the vessel's*
*intake exceeds 0.5% of the maximum quantity it is permissible to load pursuant to Clause 1 above.*

*In case Charterer has not declared the final discharge port, the Master and/or Owner to send standard notices (sailing*
*notice / E.T.A. discharge port/etc.) as per Clause 3a to Charterer only.  Unless otherwise agreed the Master on sailing*
*load port will start giving notices basis .*

~~_____ and they are to declare same to the Master not later than 48 hours following receipt of the~~
~~Master's application.~~                                                                          42


**5.    ~~Laydays/Cancelling~~ *LAYTIME / CANCELLATION***                                          43

*Laytime for loading shall not commence before :       Hours Local Time on the             Should the vessel's Notice*
*of Readiness not have been tendered in accordance with Clause 6 before 23:59 Hours Local Time on the :*
*Charterer shall have the option of cancelling the voyage in question no later than 6 hours after said notice ought to have*
*been tendered.*

~~Laytime for loading shall not commence before 0800 on the ............................. day of ..................................~~    44
~~Should the Vessel's notice of readiness not have been tendered in accordance with Clause 6, before 1700~~    45
~~on the .................................. day of ..............................., the Charterers shall have the option of cancelling this~~    46
~~Charter Party, not later than one hour after the said notice has been tendered. The said cancelling date shall~~    47
~~be extended by as many days (rounded to the nearest day) as the Charterers shall have failed to give load-~~    48
~~ing port orders as provided in Clause 3 hereabove, without prejudice to the Owners' claim for detention.~~    49

~~If the Owners warrant that, despite the exercise of due diligence by the Owners, the Vessel will not be~~    50
~~ready to tender notice of readiness by the cancelling date, and provided the Owners are able to state with~~    51
~~reasonable certainty the date on which the Vessel will be ready, they may, at the earliest seven days before~~    52
~~the Vessel is expected to sail for the port or place of loading, require the Charterers to declare whether or~~    53
~~not they will cancel the Charter. Should the Charterers elect not to cancel, or should they fail to reply with~~    54

55

~~in seven days or by the cancelling date, whichever shall first occur, then the seventh day after the expected~~ 56
~~date of readiness for loading as notified by the Owners shall replace the original cancelling date. Should~~ 57
~~the Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers~~ 58
~~in accordance with this Clause.~~

6.    **Time Counting** 59

(a)   Notice of the Vessel's readiness to load and discharge at the first or sole port shall be tendered in 60
      writing to the Charterer's *Agents any time day or night, Sundays and Holidays included, whether in berth or* 61
      *not, whether in port or not, whether in free pratique or not, whether customs cleared or not.* ~~between 0800 and~~
      ~~1700 on Mondays to Fridays and between 0800 and~~
      ~~1200 on Saturdays. Following tender of notice of readiness,~~ Laytime shall commence *12 hours* 62
      thereafter, unless the Vessel's loading or discharging has sooner commenced *which case only actual time* 63
      *used to count* ⸱

      *At both loading and discharging port notice time (turn time) not to count as laytime unless used, in which case only*
      *actual time used to count. Turn time to commence 12 hours after receipt of valid NOR or, if vessel arrived outside*
      *of laycan, 12 hours after berthing/commencement of cargo operations.*

      *Should vessel arrive and tender a valid Notice of Readiness prior to commencement of the agreed laycan, then*
      *Shippers or Charterers are not obliged to berth the vessel or commence loading prior to commencement of said*
      *laycan and turntime and begin to count after 00:01 hours on the first day of the laycan. Should Shippers or*
      *Charterers agree to commence loading the vessel prior to 00:01 hours on the first day of the laycan, then turntime*
      *shall count upon commencement of loading and only actual time used to for loading during the running of*
      *turntime, shall count.*

      *If vessel tenders Notice of Readiness after the cancelling date agreed and the Charterer has not cancelled the*
      *voyage in accordance with Clause 5, laytime will count from commencement of loading.*

      ~~Such notice of readiness shall be tendered when the Vessel is in the~~ *Notwithstanding the aforegoing, if the* 64
      loading or discharging berth
      ~~If~~ *is* available *then notice of readiness shall be tendered when the vessel is in the loading or discharging berth,* and 65
      is in all respects ready to load or discharge the cargo ~~, unless~~ *In the event that* the *loading or discharging*
      berth is not
      available on the Vessel's arrival, ~~whereupon~~ the Master may tender the said notice from a lay berth 66
      or anchorage within the port limits. 67

(b)   If the Vessel is prevented from entering the port limits because *(i)* the first or sole loading or 68
      discharging berth, or *(ii)* a lay berth or anchorage is not available, or *(iii)* on the order of the Charterer or 69
      any competent official body or authority, and the Master warrants that the Vessel is physically 70
      ready in all respects to load or discharge, ~~the Master~~ he may tender notice, by radio, if desired, from the 71
      usual
      anchorage outside the port limits, whether in free pratique or not, and/or whether customs cleared 72
      or not. If after entering the port limits the Vessel is found not to be ready, the time lost from the 73
      discovery thereof, until she is ready, shall not count as laytime or time on demurrage. 74

(c)   Once the loading or discharging berth becomes available laytime or time on demurrage shall cease 75
      until the Vessel is *fully ready to receive or discharge the cargo* in the berth, and shifting expenses shall be 76
      for the Owner's account.

(d)   *Subsequent Ports (if agreed)* - At second or subsequent ports of loading and/or discharging, laytime or 77
      time
      on demurrage shall resume counting from the Vessel's arrival in loading or discharging berth, if 78
      available, or if unavailable, from the arrival time within or outside the port limits, as provided in 79
      paragraph (a) supra. 80

(e)   *See also Clause 16 - Lighterage*

**7.**   **Laytime**                                                                                              81

(a)   The Vessel shall be loaded at the average rate of _____ *metric tons* of 1000 kilos per *weather working* day   82
~~or~~

~~pro-rata for any part of a day, or within~~ ................................................. ~~running days, both~~ of twenty-four   83
consecutive hours, ~~weather permitting~~, Sundays and Holidays ~~excepted~~/included *excluding Super Holidays*\*,   84
and discharged

at the average rate of _   *metric tons*                                                                    ıv   85
of 1000 kilos per *weather working* day ~~or pro-rata for any part of a day, or~~

~~within~~ ....................................... ~~running days, both~~ of twenty four consecutive hours, ~~weather permitting~~,   86
Sundays and Holidays ~~excepted~~ / included\* *excluding Super Holidays*.                                     87

*Days Purposes*                                                                                                  88

(b)   ~~Vessel shall be loaded and discharged within~~ ........................... ~~days of twenty-four consecutive hours,~~   89

~~weather permitting, Sundays and Holidays excepted/included\* at loading, and excepted/included\*~~   90
~~at discharge.~~                                                                                                 91

(c)   Time used in loading and discharging during excepted periods, if any, shall count as laytime.   92

~~Non-reversible laytime~~                                                                                       93

(d)   ~~In cases of separate laytime for loading and discharging, laytime shall be non-reversible.~~   94

*The following time and exception shall not count as laytime or time on demurrage:*

*Any time lost because vessel having to wait for first suitable tide to reach and enter the discharge port and
nominated berth(s) unless Charterer has guaranteed the arrival draft.*

*Any time from leaving anchorage place to loading/discharge berth.*

*All navigation risk is always for Owner's account. Any time lost at anchorage after loading or discharging
berth becomes available due to bad weather, delay of pilots, tugs or any reason connected with vessel's
navigation before vessel arrives at Charterer's nominated berth shall be for Owner's account.*

*Any time used for official draft checks and surveys are conducted at load and discharge port.*

*Any time lost for bunkering and ballasting and/or deballasting.*

*Any time lost due to inefficiency or any other cause attributable to the vessel, her Master, her crew or the
Owner which affects the working, berthing or any other operation of the vessel during loading or discharging.*

*Any time lost due to stoppages due to any breakdown on vessel- whether mechanical or electrical.*

*In case of deadfreight, laytime allowed at both ends to be calculated on the quantity loaded plus quantity of
deadfreight (due or paid).*

*Any time lost due to Force Majeure.*

\*) Delete as appropriate                                                                                        95

**8.**   **Exceptions**                                                                                          96

The Owner shall be bound before and at the beginning of the voyage to exercise due diligence to make   97
the Vessel seaworthy, and to have her properly manned, equipped and supplied, and neither the Vessel,   98
nor the Master, or Owner shall be, or shall be held liable for any loss of, or damage, or delay to the cargo   99
for causes excepted by the Hague Rules, or the Hague-Visby Rules, where applicable.   100
Neither the Vessel, her Master or Owner, nor the Charterer shall, unless otherwise expressly provided   101
in this Charter Party, be responsible for loss or damage to, or failure to supply, load, discharge or deliver   102
the cargo resulting from: Act of God, act of war, act of public enemies, pirates or assailing thieves;   103
arrest or restraint of princes, rulers or people; embargoes; seizure under legal process, provided bend is   104
promptly furnished to release vessel or cargo; floods; frosts; fogs; fires; blockades; riots; insurrections;   105
civil commotions; earthquakes; explosions; collisions; strandings and accidents of navigation; accidents   106
at the mines or to machinery or to loading equipment; or any other causes beyond the Owner's or the   107
Charterer's control; always provided that such events directly affect the loading and/or discharging   108
process of the Vessel, and its performance under this Charter Party.   109

*8A.*   *Force Majeure*

*Owner shall not be liable to Charterer, nor will Charterer be liable to Owner, for any delay or failure in the performance of obligations hereunder, if such failure or delay is due to or results from an act of war or the anticipated imminence thereof; restraints of rulers, governments, or people' act of terrorism; legislation, decrees, orders, regulations or the like in the country of origin or of the Vessel's flag; blockade, sanctions, civil commotion, political disturbances, breakdowns, accidents, or stoppages whether total or partial, at ports on railways, or other means of transport to or from the ports; epidemics; quarantine; Act of God; weather (including drought, fog, frosts, floods, snow, storms, tempest or washaways) or any other event or occurrence of any nature or kind whatsoever beyond the reasonable control of Owner and/or Charterer, always provided however that such events directly affect the loading and/or discharging process of the Vessel, and the party's performance under this Contract.*

*The party whose performance of any obligation is directly affected, or who has reason to believe such performance may be affected, by reason of any of the causes referred to above shall, as promptly as possible, give notice thereof to the other party concerned in writing , and shall also within ten (10) days thereafter notify the other party concerned, in writing, of particulars of the relevant event and supply supporting evidence.  Should any of the circumstances detailed above lead to delays up to fifteen (15) days in duration, for any of the contracted cargo(es), then either Charterer or Owner, shall take reasonable steps to make good and resume with the least possible delay, compliant with their obligations under this Charter Party.*

*Should any of the circumstances detailed above lead to delays in excess of fifteen (15) days, for any of the contracted cargo(es), then Charterer shall have the right to  cancel this Charter Party with fifteen (15) days written notice, without liability to either party; alternatively by mutual agreement, this Charter Party shall be suspended for the period so affected and Owner and Charterer shall negotiate and so decide whether terms of this Charter Party shall be extended beyond the original term by the period of suspension hereof.*

| | |
|---|---|
| **9.   Strikes** | 110 |

In the event of loss of time to the Vessel directly affecting the loading or discharging of this cargo, caused                      111
by a strike or lockout of any personnel connected with the production, mining, or any essential inland                            112
transport of the cargo to be loaded or discharged into/from this Vessel from point of origin, up to, and                         113
including the actual loading and discharging operations, or by any personnel essential to the actual loading                      114
and discharging of the cargo, *then maximum 3 (three) days to be for Owner's account and laytime not to count, but* 115
*thereafter only* half the laytime shall count during such periods, provided always that none
of the aforementioned events did exist at the date of the charter party. *Should any strike or lockout lead to delays in* 116
*excess of seventy-two (72) hours, then Charterer shall have the right to cancel this Charter Party without liability to*
*Owner, provided that Charterer first gives twenty-four (24) hours written notice to Owner.*
~~If at any time during the~~
~~continuance of such strikes or lockouts the Vessel goes on demurrage, said demurrage shall be paid at~~                          117
~~half the rate specified in Clause 10, hereunder, until such time as the strike or lockout terminates; thence~~                   118
~~full demurrage unless the Vessel was already on demurrage before the strike broke out, in which case full~~                     119
~~demurrage shall be paid for its entire period.~~                                                                                 120

| | |
|---|---|
| **10.   Demurrage/Despatch** | 121 |

Demurrage, if incurred, at loading and/or discharging port(s), shall be paid by the Charterer to the                             122
Owner at the rate of *U.S $*                                                                    ` per day, or pro-rata for part of a  123
day.
Despatch money shall be
paid by the Owner to the Charterer at half the demurrage rate for all laytime saved *both ends.*                                  124

| | |
|---|---|
| **11.   Cost of Loading and Discharging** | 125 |

126

The cargo shall be loaded, dumped, spout trimmed, and discharged by *the Shippers* ~~Charterers'*~~/Receivers'*
stevedores *at their expense*, free of risk and expense to the Vessel, under the supervision of the Master. Should  127
The
stevedores refuse to follow his instructions, the Master shall protest to them in writing and shall advise           128
the Charterer immediately thereof.                                                                                   129

**12.** **Overtime**                                                                                                    130

(a)  *Expenses*                                                                                                         131

    (i)   All overtime expenses at loading and discharging ports shall be for account of the party          132
        ordering same *unless caused by the fault or neglect of the Owner.*                                   133

    (ii)  If overtime is ordered by port authorities or the party controlling the loading and/or                134
        discharging terminal or facility, all overtime expenses shall be equally shared between the          135
        Owner and the Charterer* *and time to count.* ~~Receivers*~~                                         136

    (iii) Overtime expenses for the Vessel's officers and crew shall always be for the Owner's            137
        account.                                                                                             138

(b)  *Time Counting*                                                                                                    139

    If overtime work ordered by the Owner be performed during periods excepted from laytime the                140
    actual time used shall count; if ordered by the Charterer/Receivers, the actual time used shall not      141
    count; if ordered by port authorities or the party controlling the loading and/or discharging terminal   142
    or facility half the actual time used shall count.                                                       143
~~*) Delete as appropriate~~                                                                                             144

**13.** **Opening & Closing Hatches**                                                                                   145

Opening and closing of hatches at commencement and completion of loading and discharging shall be for                  146
the Owner's account *unless caused by the fault or neglect of the Owner* and time so used is not to count. All other    147
opening and closing of hatches shall be
for the Charterer's account and time so used shall count.                                                               148

*After completion of loading and/or discharging the vessel shall close hatches and vacate the berth as ordered by the
Shippers or Receivers. If after completion of loading of discharging vessel remains at the berth for Owner's purposes,
Owner shall be responsible for all costs, direct or indirect, charged by the terminal, suppliers, receivers and/or any
other party and time not to count as laytime or demurrage.*

*Bilges :*
*Master to monitor vessel's bilges on a daily basis and pump out, if required, any excess water emerging from the cargo.
Master to keep a log of any bilge water quantities pumped overboard for Charterer's records, if instructed by
Charterer.*

**14.** **Seaworthy Trim**                                                                                              149

Charterer shall leave the Vessel in seaworthy trim and with cargo on board safely stowed to Master's                   150
satisfaction between loading berths/ports and between discharging berths/ports, respectively; ~~any~~                   151
~~expenses resulting therefrom shall be for Charterers' account and any time used shall count.~~                        152

*Any extra trimming or extra leveling of the cargo required by the Owner/vessel/Master shall be for Owner's account and
time used shall not count as laytime or time on demurrage.*

*DRAFT SURVEY:*

*Quantity of cargo loaded on board the vessel shall be determined in accordance with customary international practices at
the loadport by means of a draft survey carried out at Charterer's expenses by a qualified independent surveyor appointed
by Charterer in accordance with Clause 15 below. Owner to co-operate fully in the execution of the draft survey.  Save in
the event of manifest error, the independent surveyor's determination shall be final and binding upon the parties and the
Master shall sign a certificate stating that the weight of the cargo loaded is in accordance with the draft survey.*

**15.** **Shifting** *and Cargo Surveying:*                                                                             153

If more than one berth of loading and discharging has been agreed, and used, costs of shifting, ~~including~~          154
excluding
cost of bunkers used, shall be for the Charterer's account, time counting. *However, warping by mooring lines*         155
*between berth(s), if any, to be for Owner's account and not to count as laytime or time on demurrage.*

*CARGO SURVEYING:*

*Subject to Head Owners' approval, Time Chartered Owner will permit Charterer's representatives and/or inspectors/surveyors on board the vessel at loading and/or discharging port(s) / place(s). If need be, the vessel shall deviate from its route to the loading or discharging port(s)/place(s) at Charterer's request in order for the Charterer's representative and/or cargo inspectors/surveyors to board/disembark. Charterer shall pay for all reasonable and proven holds, and subject to Owner's prior approval, cofferdams, ballast and slop tanks or any other void space on the vessel prior to, during and after the time of the vessel's loading and discharge with extra time, if any, to count as used laytime or time on demurrage if the vessel is on demurrage, unless caused by the fault or neglect of the Owner, vessel, her Master, crew or the representatives of any of them. The independent surveyor's work papers setting forth his determination of quantity of cargo and cleanliness of holds and signed by the Master shall be final and binding upon the parties. Charterer will indemnify Owner for any risks associated with Charterer's representatives going aboard the vessel. Any inspection of the vessel, other than of the cargo holds, shall only be carried out in consultation with Owner and Owner shall fully co-operate with Charterer's appointed inspectors/surveyors.*

## 16. Lighterage                                                                                                 156

Should *there be a change in discharge order and* the Vessel be ordered to discharge at a place where there is      157
insufficient water for the Vessel to
reach it in the first tide after her arrival there, without lightening and lie always afloat, laytime shall count      158
as per Clause 6 at a safe anchorage or lightening place for similar size vessels bound for such a place,             159
and any lighterage expenses incurred to enable her to reach the place of discharge shall be for the                  160
Charterer's account, any custom of the port to the contrary notwithstanding. Time occupied in                       161
proceeding from the lightening place to the discharging berth shall not count as laytime or time on                 162
demurrage.                                                                                                          163

*If lightening is necessary due to the vessel/Owner not complying with the restrictions at the discharge berth, then cost of lighterage to be for Owner's account and time used not to count as laytime.*

*However, if Charterer has not declared the discharge port prior to vessel's arrival at load port - or latest on commencement of loading of the vessel, Owner not to be held responsible and accountable for the lighterage.*

## 17.   Agents                                                                                                   164

The Vessel shall be consigned to *Charterers'* ................................................. agents at port(s) of loading, and to      165
*Charterers'* .................................................................................................... agents at port(s) of discharge.      166

*Owner paying the customary agency fees and supplying funds in advance to Agents at both ends for all port costs.*

## 18.   Extra Insurance on Cargo                                                                                  167

Any extra insurance on cargo, incurred owing to Vessel's age, class, flag, or ownership to be for Owner's           168
account up to a maximum of...................................................... and may be deducted from the freight in the      169
Charterer's option. The Charterer shall furnish evidence of payment supporting such deduction.                     170

*OWNERS' LIABILITY:*

*Owner warrants that neither the vessel nor its Owner not any third party that has any Ownership interest in the vessel, direct or indirect, are the subject of any laws, rules, regulations or orders of the United States of America under which Charterer could be penalised for or prohibited from Chartering the vessel. Owner agrees to indemnify and hold Charterer harmless from and against any liability or alleged liability and all claims, demands, actions and causes of actions of whatsoever nature or character including all costs, expenses and legal fees in defending same, which may be asserted by a third party or which Charterer may incur to a third party arising out of or as a consequence of Owner's breach or alleged breach of a warranty or representation under this Charter Party.*

## 19.   Stevedore Damage                                                                                         171

(a)   Any damage caused by stevedores shall be settled directly between the Owner and the                          172
       stevedores. *If required by Owner, Charterer to assist to recover damages from stevedores.*                 173

(b)   *In case the Owners are unsuccessful in obtaining compensation from the stevedores for damage    174
      for which they are legally liable, then the Charterers shall indemnify the Owners for any sums so    175
      due and unpaid.    176

*) Sub-clause (b) is optional and shall apply unless deleted.    177

**20.   Deviation**    178

Should the Vessel deviate to save or attempt to save life or property at sea, or make any reasonable    179
deviation, the said deviation shall not be deemed to be an infringement or breach of this Charter Party,    180
and the Owner shall not be liable for any loss or damage resulting therefrom provided, however, that if    181
the deviation is for the purpose of loading or unloading cargo or passengers, it shall "prima facie", be    182
regarded as unreasonable.    183

**21.   Lien and Cesser**    184

The Charterer's liability under this Charter Party shall cease on cargo being shipped, except for payment    185
of freight, deadfreight and demurrage, and except for all other matters provided for in this Charter Party    186
where the Charterer's responsibility is specified. The Owner shall have a lien on the cargo for freight,    187
deadfreight, demurrage and general average contribution due to them under this Charter Party.    188

**22.   Bills of Lading**    189

The bills of lading shall be prepared in accordance with the dock or railway weight and shall be endorsed    190
by the Master, agent or Owners, weight unknown, freight and all conditions as per this Charter, such bills    191
of lading to be signed at the Charterers' or shippers' office within twenty four hours after the Vessel is    192
loaded. The Master shall sign a certificate stating that the weight of the cargo loaded is in accordance    193
with railway weight certificate. The Charterers are to hold the Owners harmless should any shortage    194
occur.    195

*In accordance with Clauses 14 and 15, the Bill(s) of Lading shall be prepared on the basis of the draft survey weight certificate issued by an independent surveyor paid by the Charterer and in accordance with all conditions of this Charter Party, such Bill(s) of Lading to be signed at the Charterer's or Shippers' office within twenty four hours after the vessel is loaded. The Master shall sign a certificate stating that the weight of the cargo is in accordance with the draft weight certificate.*

*The discharge port shown on the Bill(s) of Lading does not necessarily constitute a declaration of discharge port and Charterer shall have the option to order the vessel to any other port within the terms of the Charter Party.*

*Charterer shall indemnify Owner and hold it harmless in respect to the change of discharge port destination by Letter of Indemnity in accordance with Owner's P and I Club wording.*

*In the event that the original Bill(s) of Lading are not available at discharge port in time at vessel's arrival, Owner agrees to release the cargo against Charterer's Letter of Indemnity, as per Owner's P and I Club wording.*

**23.   Grab Discharge**    196

No cargo shall be loaded in any cargo compartment inaccessible to reach by grabs.    197

*23.   OWNERS' REQUIREMENTS:*

*a)   VESSEL'S COMPLIANCE*

*Owner shall, at his risk and expense ensure that the performing vessel does comply with all applicable rules, regulations and laws including but not limited to water and/or air pollution at ports of loading and discharging in force throughout the currency of this Charter Party.*

*b)   EXTRA INSURANCE*

*Any additional or increased insurance premium payable in relation to the cargo due to vessel's age or flag, classification or ownership shall be for Owner's account. Extra insurance due to vessel's age is not applicable for tonnage below 20 years. Any extra insurance, if any, to be paid upon presentation of cargo insurers' invoice and same not to exceed that applicable on London market for similar vessels.*

c) *DOCUMENTATION TO BE MADE AVAILABLE TO CHARTERERS*

*If required by Charterer, Owner undertakes to use its best efforts to issue or otherwise supply any letter or certificates in connection with the vessel's classification, registration, age, flag, gear, details of vessel's entry in a P and I Club or any other certificates whatsoever available to Owner that Charterer may require to comply with and negotiate letters of credit for sale of the cargo and/or satisfy any requirements by Shippers and/or Receivers and/or import permits. All above is subject to the fact that the Owner can obtain the required documentation. In case Owner cannot obtain the required certificates they cannot be held responsible.*

d) *QUESTIONNAIRE:*

*Owner warrants to the best of their knowledge that the reply in the Questionnaire given to Charterer shall be true and correct. The completion of the Questionnaire and acceptance of the vessel by Charterer shall not release Owner from any of its warranties and obligations set out elsewhere in any contract or other agreement between Owner and Charterer, nor shall the same act as waiver of Charterer's rights against Owner in relation to any such contract or agreement.*

e) *CASUALTY PROCEDURE:*

*Should the vessel arrive at any port or ports with damage that has caused water to ingress into the vessel's hull or with any other damage whatsoever, the Captain or Owner shall without delay, inform the Charterer thereof. Owner warrants that the Master shall inform Charterer immediately by telephone (confirmed by telex/fax) if any situation or occurrence which results or is likely to result in either delays or damage to vessel or her machine systems (including but not limited to failure of inert gas system or cargo system) or vessel's proceeding to the assistance of other vessels or damage to cargo or pollution, oil spill and/or oil discharge.*

f) *OWNER'S COMPLIANCE SOLAS:*

*Owner warrants that the vessel complies with SOLAS safety regulations presently in force and/or modified during the Charter period. The vessel shall have on board all valid SOLAS certificates.*

g) *I.T.F.*

*The vessel is to comply with I.T.F. regulations or bona fide equivalent Trade Union agreement and any delay and/or extra expenses incurred due to vessel's crew wages and/or terms not complying with those laid down by the International Transport Worker's Federation (I.T.F.) to be for Owner's account.*

h) *BIMCO STANDARD ISM CLAUSE*

*From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter party, the Owner shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owner shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterer.*

*Except as otherwise provided in this Charter party, loss, damage, expense or delay caused by failure on the part of the Owner or "the Company" to comply with the ISM Code shall be for the Owner's account.*

i) *INSURANCE:*

*Owner guarantees that from the time of delivery and throughout the vessel's service under this Charter Party the vessel shall be entered for full protection and indemnity insurance by the following first class protection and indemnity (P&I) club, which the owners guarantee to be a full member of the International Group of P&I Clubs in both protection and indemnity classes:*

[Owner to provide details of Vessel's P&I club]

*Owners guarantee that from the time of delivery and throughout the Vessel's service under this Charter Party the vessel shall be entered for full hull and machinery cover.*

*Owners warrant that they have in place and will maintain throughout the period of this Charter:*

*(i) insurance cover for oil pollution for the maximum on offer through the International Group of P and I Clubs (currently USD 1 billion) and that this cover will remain in place throughout the period of this Charter; and*

*(ii) any additional oil pollution cover which becomes available via Owner's P. & I. Club or through Underwriters providing first class security.*

### j) DRUG AND ALCOHOL POLICY:

*Owner warrants that it has a policy on Drug and Alcohol Abuse ("Policy") applicable to the vessel which meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines for the Control of Drugs and Alcohol Onboard Ship. Under the Policy, alcohol impairment shall be defined as a blood alcohol content of 40 mt/100,1 or greater, the appropriate seafarers to be tested shall be all vessel Officers and the drug/alcohol testing and screening shall include unannounced testing in addition to routine medical examinations. An objective of the Policy should be that the frequency of the unannounced testing be adequate to act as an effective abuse deterrent and that all Officers be tested at least once a year through a combined program of unannounced testing and routine medical examinations.*

*Owner further warrants that the Policy will remain in effect during the term of this Charter and that Owner shall exercise due diligence to ensure that the Policy is complied with. It is understood that an actual impairment or any test finding of impairment shall not in and of itself mean the Owner has failed to exercise due diligence*

### k) WARRANTY OF SUITABILITY:

*Owner warrants that the vessel shall be suitable in every respect, whether physical or otherwise to enter, berth at, load and discharge and leave the declared load and discharge ports and that it is not subject to any sanctions imposed under the resolutions of the United Nations Security Council or the laws, rules or regulations of the countries in which the load and discharge ports are located which would preclude it from or penalise Charterer for the vessel entering, berthing at, discharging and leaving such ports.*

*Owner warrants:*

*1)   that the vessel complies and will continue to comply with all laws, requirements and regulations applicable from time to time at any of the ports, berths, terminals and places to which Charterer may order her to proceed as specified in this Charter party and in any subsequent voyage order and*

*2)   that the vessel is and will remain in all respects eligible for trading to and acceptable by the operator of any such ports, berths, terminals or other places. The vessel shall have on board all certificates, records and other documents required for such service. Owner warrants that the vessel shall, during the period covered by this Charter Party, be in full compliance with all applicable international conventions, laws and regulations and/or requirements of the country of the vessel's registry. Owner warrants that to the best of their knowledge the vessel is not blacklisted at the load and/or discharge port/terminal. Without prejudice to any other rights available to Charterer:*

*i.   Any delay incurred because of the vessels failure to comply with the above shall not count as laytime, or if the vessel is on demurrage, as time on demurrage.*

*ii.   Any directly related losses, costs or expenses incurred or suffered because of the vessels failure to comply with the above shall be for Owner's account.*

## 24.   Protective Clauses

198

This Charter Party is subject to the following clauses all of which ~~are also to~~ *shall also* be included in all bills of lading issued hereunder *and in the event of any conflict between the following Clauses and the Bill of Lading terms, the following Clauses shall prevail:*   199 200

(a)   ~~"CLAUSE PARAMOUNT: This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such term shall be void to that extent, but no further."~~   201 202 203 204 205 206 207 208

**GENERAL CLAUSE PARAMOUNT**

*The International convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25th August 1924 (the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (the "Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.*

*When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.*

*The Protocol signed at Brussels on 21st December 1979 (the "SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.*

*The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier.*

| | | |
|---|---|---|
| ~~and~~ | | 209 |
| (b) | "BOTH-TO-BLAME COLLISION CLAUSE: If the vessel comes into collision with another vessel | 210 |
| | as a result of the negligence of the other vessel and any act, neglect or default of the master, | 211 |
| | mariner, pilot or the servants of the carrier in the navigation or in the management of the vessel, | 212 |
| | the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to | 213 |
| | the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, | 214 |
| | or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other | 215 |
| | or non-carrying vessel or her owners to the owners of said goods and set off, recouped or recovered | 216 |
| | by the other or non-carrying vessel or her owners as part of their claim against the carrying vessel or | 217 |
| | carrier. | 218 |
| | The foregoing provisions shall also apply where the owners, operators or those in charge of any | 219 |
| | vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in | 220 |
| | respect to a collision or contact." | 221 |
| and | | 222 |
| (c) | "NEW JASON CLAUSE: In the event of accident, danger, damage or disaster before or after | 223 |
| | commencement of the voyage, resulting from any cause whatsoever, whether due to negligence | 224 |
| | or not, for which, or for the consequences of which, the carrier is not responsible, by statute, | 225 |
| | contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute | 226 |
| | with the carrier in general average to the payment of any sacrifices, losses or expenses of a | 227 |
| | general average nature that may be made or incurred, and shall pay salvage and special charges | 228 |
| | incurred in respect of the goods. | 229 |
| | If a salving vessel is owned or operated by the carrier, salvage shall be paid for as fully as if such | 230 |
| | salving vessel or vessels belonged to strangers. Such deposit as the carrier or his agents may deem | 231 |
| | sufficient to cover the estimated contribution of the goods, and any salvage and special charges | 232 |
| | thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to | 233 |
| | the carrier before delivery." | 234 |
| and | | 235 |
| (d) | "PROTECTION AND INDEMNITY BUNKERING CLAUSE: The Vessel in addition to all other | 236 |
| | liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to | 237 |
| | any port or ports whatsoever whether such ports are on or off the direct and/or customary route | 238 |
| | or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in | 239 |
| | any quantity in the discretion of the Owner even to the full capacity of fuel tanks, deep tanks | 240 |
| | and any other compartment in which oil can be carried whether such amount is or is not required | 241 |
| | for the chartered voyage." | 242 |
| **25.** | ~~Ice Clause~~ | 243 |
| | ~~Loading Port~~ | 244 |

(a)   ~~If the Vessel cannot reach the loading port by reason of ice when she is ready to proceed from~~   245
      ~~her last port, or at any time during the voyage, or on her arrival, or if frost sets in after her arrival,~~   246
      ~~the Master — for fear of the Vessel being frozen in — is at liberty to leave without cargo; in such~~   247
      ~~cases this Charter Party shall be null and void.~~   248

(b)   ~~If during loading, the Master, for fear of the Vessel being frozen in, deems it advisable to leave,~~   249
      ~~he has the liberty to do so with what cargo he has on board and to proceed to any other port with~~   250
      ~~option of completing cargo for the Owners' own account to any port or ports including the port~~   251
      ~~of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination~~   252
      ~~at the Vessel's expense against payment of the agreed freight, provided that no extra expenses~~   253
      ~~be thereby caused to the Consignees, freight being paid on quantity delivered (in proportion if~~   254
      ~~lump sum), all other conditions as per Charter Party.~~   255

(c)   ~~In case of more than one loading port, and if one or more of the ports are closed by ice, the~~   256
      ~~Master or Owners to be at liberty either to load the part cargo at the open port and fill up~~   257
      ~~elsewhere for the Owners' own account as under sub-clause (b) or to declare the Charter Party~~   258
      ~~null and void unless the Charterers agree to load full cargo at the open port.~~   259

      ~~Voyage and Discharging Port~~   260

(d)   ~~Should ice prevent the Vessel from reaching the port of discharge, the Charterers/Receivers shall~~   261
      ~~have the option of keeping the Vessel waiting until the re-opening of navigation and paying~~   262
      ~~demurrage or of ordering the Vessel to a safe and immediately accessible port where she can~~   263
      ~~safely discharge without risk of detention by ice. Such orders to be given within 48 hours after~~   264
      ~~the Owners or Master have given notice to the Charterers/Receivers of impossibility of reaching~~   265
      ~~port of destination.~~   266

(e)   ~~If during discharging, the Master, for fear of the Vessel being frozen in, deems it advisable to~~   267
      ~~leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest safe~~   268
      ~~and accessible port. Such port to be nominated by the Charterers/Receivers as soon as possible,~~   269
      ~~but not later than 24 running hours, Sundays and holidays excluded, of receipt of the Owners'~~   270
      ~~request for nomination of a substitute discharging port, failing which the Master will himself~~   271
      ~~choose such port.~~   272

(f)   ~~On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the~~   273
      ~~Owners shall receive the same freight as if the Vessel had discharged at the original port of~~   274
      ~~destination, except that if the distance to the substitute port exceeds 100 nautical miles the~~   275
      ~~freight on the cargo delivered at that port to be increased in proportion.~~   276

*25. POLLUTION AND FINANCIAL RESPONSIBILITY:*

*Owner warrants and agrees that it and the vessel shall comply with all laws, regulations and/or other governmental requirements of whatsoever kind with respect to pollution, applicable to the vessel entering, leaving, remaining at or passing through any ports or waters in the performance of this Charter Party, including but not limited to, financial capability, responsibility, security, environmental liability or like laws or requirements. Owner at its sole risk and expense shall make documentary evidence and take all such other action as may be necessary to satisfy such laws, regulations and/or other requirements. Owner shall indemnify, defend and hold harmless Charterer against all consequences resulting from any failure, inability or omission of Owner and/or the vessel to do or comply with the foregoing. Any delay resulting to the vessel because of Owner's or vessel's failure, inability or omission shall not count as used laytime or demurrage and shall be at the risk and for the account of the Owner. The obligation of Owner under this Clause shall survive the termination of this Charter Party.*

26.   **General Average**   277

General average shall be adjusted according to York-Antwerp Rules ~~1974, as amended~~ *1994* ~~1990,~~ or any   278
subsequent modification thereof, in *London, and settled in United States Dollars.* ~~currency.~~   279
                                                                                                        280

~~27.~~   ~~**War Risks**~~   281

~~1.~~   ~~The Master shall not be required or bound to sign Bills of Lading for any blockaded port or for any~~   282
       ~~port which the Master or Owners in his or their discretion consider dangerous or impossible to~~   283
       ~~enter or reach.~~   284

~~2.~~   ~~(A) If any port of loading or of discharge named in this Charter Party or to which the Vessel~~   285
       ~~may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or~~   286

(B) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions, 287
or the operation of international law (a) entry to any such port of loading or of discharge or the 288
loading or discharge of cargo at any such port be considered by the Master or Owners in his or 289
their discretion dangerous or (b) it be considered by the Master or Owners in his or their discretion 290
dangerous or impossible for the Vessel to reach any such port of loading or of discharge - the 291
Charterers shall have the right to order the cargo or such part of it as may be affected to be 292
loaded or discharged at any other safe port of loading or of discharge within the range of loading 293
or discharging ports respectively established under the provisions of the Charter Party (provided 294
such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is 295
not in the Master's or Owners' discretion dangerous or prohibited). If in respect of a port of 296
discharge no orders be received from the Charterers within 48 hours after they or their agents 297
have received from the Owners a request for the nomination of a substitute port, the Owners shall 298
then be at liberty to discharge the cargo at any safe port which they or the Master may in their 299
or his discretion decide on (whether within the range of discharging ports established under the 300
provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfilment 301
of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the 302
event of the cargo being loaded or discharged at any such other port within the respective range 303
of loading or discharging ports established under the provisions of the Charter Party, the Charter 304
Party shall be read in respect of the freight and all other conditions whatsoever as if the voyage 305
performed were that originally designated. In the event, however, that the Vessel discharges the 306
cargo at a port outside the range of discharging ports established under the provisions of the 307
Charter Party, freight shall be paid for as for the voyage originally designated and all extra 308
expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat 309
shall be paid by the Charterers or cargo owners. In this latter event the Owners shall have a lien 310
on the cargo for all such extra expenses. 311

3..   The Vessel shall have liberty to comply with any directions or recommendations as to departure, 312
arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise 313
whatsoever given by the government of the nation under whose flag the Vessel sails or any other 314
government or local authority including any de facto government or local authority or by any 315
person or body acting or purporting to act as or with the authority of any such government or 316
authority or by any committee or person having under the terms of the war risks insurance on the 317
Vessel the right to give any such directions or recommendations. If by reason of or in compliance 318
with any such directions or recommendations, anything is done or is not done such shall not be 319
deemed a deviation. 320

If by reason of or in compliance with any such directions or recommendations the Vessel does 321
not proceed to the port or ports of discharge originally designated or to which she may have been 322
ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of 323
discharge which the Master or Owners in his or their discretion may decide on and there discharge 324
the cargo. Such discharge shall be deemed to be due fulfilment of the contract or contracts of 325
affreightment and the Owners shall be entitled to freight as if discharge has been effected at the 326
port or ports originally designated or to which the Vessel may have been ordered pursuant to the 327
terms of the Bill of Lading. All extra expenses involved in reaching and discharging the cargo at 328
any such other port of discharge shall be paid by the Charterers and/or cargo owners and the 329
Owners shall have a lien on the cargo for freight and all such expenses. 330

27.   **WAR RISKS CLAUSE FOR VOYAGE CHARTERING, 1993  (CODE NAME: VOYWAR 1993)**

*1.  For the purpose of this Clause, the words :*

*a)   "Owners" shall include the ship owners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and*

*b)   "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgment of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.*

2. If at any time before the Vessel commences loading, it appears that, in the reasonable judgment of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterer cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterer, the Vessel, her cargo, crew, or other persons onboard the vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterer to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterer shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

3. The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgment of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If should so appear, the Owners may by notice request the Charterer to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterer shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfillment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterer the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

4. If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgment of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally an customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterer that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

5. The vessel shall have liberty :-
a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risk insurance;

c) to comply with the terms of any resolution of the Security council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owner's own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

g) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfillment of the Contract of Carriage.

**28.**   **Dues and/or Taxes**                                                                    331

*Any dues and/or dues on the vessel and/or freight to be for Owner's account. Any taxes and/or dues on cargo to be for*      332
*Charterer's account.  QWT dues at Hamburg to be for Receivers' account…………….………………………………*   333
.............................................................................................................................................................   334

**29.**   **Transfer**

The Charterer shall have the privilege of transferring part or whole of the Charter Party to others,      336
guaranteeing to the Owner due fulfillment of this Charter Party. *Damages for non-performance of this Charter*   337
*Party shall not exceed the estimated amount of freight due hereunder.*

**30.**   **Address Commission**                                                                   338

An address commission of          ........................ % on gross freight, deadfreight, and demurrage is due to the   339
Charterer at the time these are paid, Vessel lost or not lost. The Charterer shall have the right to   340
deduct such commissions from such payments.                                                        341

**31.**   **Brokerage Commission**                                                                 342

A brokerage commission of *1.25* ....................... % on gross freight, deadfreight and demurrage is payable by the   343
Owner to  *H. CLARKSON & CO. LTD., LONDON* …………. .........................................................................   344
..............................................................................................................................................   345
........................................................................................ at the time of the Owner receiving these payments.   346

**32.**   **Arbitration**                                                                          347

(a)   ~~*NEW YORK~~                                                                                348

~~All disputes arising out of this contract shall be arbitrated at New York in the following manner,~~   349
~~and subject to U.S. Law:~~                                                                       350

~~One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen.~~   351
~~Their decision or that of any two of them shall be final, and for the purpose of enforcing any~~   352
~~award, this agreement may be made a rule of court. The Arbitrators shall be commercial men,~~   353
~~conversant with shipping matters. Such Arbitration is to be conducted in accordance with the~~   354
~~rules of the Society of Maritime Arbitrators Inc.~~                                              355

~~For disputes where the total amount claimed by either party does not exceed US~~                 356
~~$ ...............................................** the arbitration shall be conducted in accordance with the Shortened~~   357
~~Arbitration Procedure of the Society of Maritime Arbitrators Inc.~~                              358

(b)   ~~*LONDON~~                                                                                  359

~~All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree~~   360
~~forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on~~   361
~~business in London who shall be members of the~~                                                 362
~~Baltic Mercantile & Shipping Exchange and~~
~~engaged in Shipping, one to be appointed by each of the parties with power to such Arbitrators~~   363
~~to appoint an Umpire~~                                                                           364
~~No award shall be questioned or invalidated on the~~
~~ground that any of the~~
~~Arbitrators is not qualified as above, unless objection to his action be taken before the award is~~   365
~~made. Any dispute arising hereunder shall be governed by English Law.~~                          366

~~For disputes where the total amount claimed by either party does not exceed US $~~               367
~~............................** the arbitration shall be conducted in accordance with the Small Claims Procedure of~~   368
~~the London Maritime Arbitrators Association.~~                                                   369

*The formation, existence, construction, performance, validity and all aspects whatsoever of this Contract or of*
*any term of this Contract shall be governed by and construed in accordance with the law of England and Wales*

*The parties agree that any claim, dispute or difference of whatever nature arising under, out of or in connection with this Contract (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with this Contract), shall be referred to and finally settled by arbitration in accordance with the terms of the London Maritime Arbitrators Association (the "LMAA Rules") as at present in force and as modified by this clause, which Rules, shall be deemed incorporated into this clause.*

*The seat of the arbitration shall be London, England and the language of the arbitration shall be English.*

*The number of arbitrators shall be three. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified.*

*The third arbitrator, who shall act as chairman of the tribunal, shall be chosen by the two arbitrators appointed by or on behalf of the parties. If the two said arbitrators do not appoint a third arbitrator within 10 working days of one party calling upon the other to do so, the President of the LMAA shall, on the application of either arbitrator or of a party, appoint the third arbitrator.*

*If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.*

*Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.*

*In cases where neither the claim nor any counterclaim exceeds the sum of USD 100,000.00 the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.*

*In cases where the claim or any counterclaim exceeds the sum agreed for the LMAA Small Claims Procedure and neither the claim nor any counterclaim exceeds the sum of USD 400,000.00 the arbitration shall be conducted in accordance with the LMAA Intermediate Claims Procedure current at the time when the arbitration proceeding are commenced*

*c) TIME BAR*

*Charterer shall be discharged and released from all liability in respect of any claims (including but not limited to claims for deadfreight, demurrage, port expenses or arising out of or in connection with shifting expenses) unless such claim has been received in writing by Charterer with all supporting documents within [eighteen (18)] months from completion of discharge of the cargo carried under this Charter Party. With prejudice to the foregoing, any demurrage invoice shall be supported with copies of original documents duly signed without authorised signatures including but not limited to Notice of Readiness, timesheets, Letters of Protest, if not already provided. If requested by Charterer, Owner shall also provide originals of the supporting documents. Any claims which Owner may have under this Charter Party shall be deemed waived and absolutely barred if the claim, together with supporting documents as herein specified, are not received by Charterer within the time period specified above.*

~~* Delete (a) or (b) as appropriate~~                                                           370

~~** Where no figure is supplied in the blank space this provision only shall be void but the other provisions~~       371
~~of this clause shall have full force and remain in effect.~~                                          372

*33. LOAD AND DISCHARGE PORT TERMINAL REGULATIONS:*

*Owner / Vessel / Master to comply with all rules, regulations and requirement and to satisfy themselves as to all drafts and other restrictions at the loading port terminal/facilities/appliances. Such rules, regulations and requirements are to be fully incorporated into this Charter Party for their full terms and effect and any time lost as a result of Owner / Vessel / Master failure to so comply or to so satisfy shall not count as laytime or time on demurrage.*

*34. ISPS CLAUSE FOR VOYAGE CHARTER PARTIES:*

*ISPS Clause for Voyage Charter Parties*

(a)   (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owner shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owner shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterer. The Owner shall provide the Charterer with the full style contact details of the Company Security Officer (CSO).

   (ii) Except as otherwise provided in this Charter Party, proven loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owner or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owner's account.

(b)   (i) The Charterer shall provide the CSO and the Ship Security Officer (SSO ) /Master with their full style contact details and any other information the Owner requires to comply with the ISPS Code.

   (ii) Except as otherwise provided in this Charter Party, proven loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterer to comply with this Clause shall be for the Charterer's account and any delay caused by such failure shall be compensated at the demurrage rate.

(c)   Provided that the delay is not caused by the Owner's failure to comply with their obligations under the ISPS Code, the following shall apply:

   (i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

   (ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterer at the demurrage rate.

(d)   Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterer's account, unless such costs or expenses result solely from the Owner's negligence. All measures required by the Owner to comply with the Ship Security Plan shall be for the Owner's account.

(e)   If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## 35. ALTERNATIVE DISCHARGE PORT:

Charterers to have the option to discharge at an alternative and/or additional safe berth, safe port or safe anchorage within the                              RANGE :                              other than those specifically named in this Charter Party, in which case the freight rate to reflect the same Time Charter return as l         discharge.

Calculations on open book basis - any differences to be settled with balance of freight.

## 36. WAR RISK INSURANCE PREMIUMS:

i) Basic war risk insurance premium for World wide trading shall be for Owner's Account.  Any additional net premium on vessel's hull and machinery war risk insurance due to the vessel's trading to a war risk zone (as defined by the London insurance market) shall be for Charterer's account.

ii) Charterer shall be charged for any additional premium war risk insurance and crew bonus incurred by the vessel for the first nine days in a war risk zone. If the vessel is delayed in the war risk zone beyond the nine days then such additional premium to be for the Charterer's account unless delay is caused by reasons directly attributable to the Owner.  For the purpose of this Clause, time is to count from the first entry of the vessel into the war risk zone.

iii) At time of fixing, Owner shall advise of vessel's hull and machinery value including increased value.

iv) If requested by the Charterer, the Owner shall advise in writing the net premium in effect.

v) Charterer shall not be responsible for any time lost as a result of the vessel remaining in an additional premium zone due to action by vessel's officers, breakdown and/or accident to the vessel or her equipment not caused by default of Charterer, or as a result of Officers and/or crew refusing to proceed to an additional premium zone.

*vi) Any additional premiums due from Charterer shall be documented by Underwriters and Charterer shall pay only the additional net premium charged to Owner (i.e. gross premium less rebate, if any).*

*vii) Any premiums, or increases thereto, attributable to closure (i.e. blocking, trapping) insurance shall be for Owner's account.*

### 37. COFR / US REGULATIONS
*Owners undertake that the Vessel shall carry on board a valid USCG Certificate of Financial Responsibility ("COFR") as required under the US Federal Oil Pollution Act 1990 and that for the duration of this Charter the said COFR shall be maintained in all respects valid for trading to ports in the USA. Owners further undertake that the Vessel shall carry on board copies of the Vessel's Federal Oil Spill Response Plan and any US State specific Response Plan (individually and collectively "Response Plan") that have been approved by the USCG or by the appropriate State Authority respectively and that the Master shall operate the Vessel fully in accordance with the said Response Plan.*

### 38. ANTI-BOYCOTT CLAUSE
*Except where compliance puts a party in conflict with the laws to which it is subject and notwithstanding anything to the contrary stated or implied in this Charter, no provision of this Charter shall be interpreted or applied so as to require either party or any of its affiliates to take, or to refrain from taking, any action in connection with this Charter, that would cause it or any of its affiliates to violate applicable laws and regulations of the US, the UK, the EU, or the United Nations (including US Laws restricting participation in or compliance with certain foreign boycotts, directly or indirectly (as contained in the U.S. Export Administration Act of 1979 and the U.S. Internal Revenue Code) and the U.S. Foreign Corrupt Practices Act and Economic Sanctions.*

### 39. CARGO EXCLUSIONS
*The Vessel is not to be employed in cargo of Cuban, Iranian, Syrian, Northern Sudanese, Burmese (Myanmar) or North Korean origin, or origin from any other country that becomes the target of US Economic Sanctions, for as long as those countries are the target of Economic Sanctions.*

### 40. TRADING EXCLUSIONS
*The Vessel is not to trade to or from Cuba, Iran, Syria, Northern Sudan, Myanmar or North Korea or any other country that becomes the target of US Economic Sanctions, for as long as those countries are the target of Economic Sanctions.*

### 41. ECONOMIC SANCTIONS
*"Economic Sanctions" means any economic sanction or trade restriction imposed by any rule, regulation or statute of the United States, the United Kingdom, the European Union, or the United Nations, including, without limitation, those administered by the Office of Foreign Asset Control of the United States Treasury Department ("OFAC"), and any other applicable laws imposing economic sanctions or trade restrictions.*

*Owners represent and warrant that:-*

*(a) The Vessel is not named, and its IMO number is not, on the list of Specially Designated Nationals and Blocked Persons (the "SDN List") as published and amended from time to time by OFAC or any equivalent list maintained by the United States (including the US Department of Commerce, the US Treasury Department or the US State Department), the United Nations, the United Kingdom or the European Union ("Equivalent List");*

*(b) The Vessel's registered owner is not named on the SDN List or any Equivalent List;*

*(c) The Vessel is not owned, chartered, operated, controlled (directly or indirectly) or insured by any person or entity named on the SDN List or any Equivalent List;*

*(d) The Vessel is not flagged or registered by a country that is the target of US Economic Sanctions; and*

*(e) The Vessel is not owned, chartered, operated, controlled (directly or indirectly) or insured by any person or entity that is registered, constituted or organised in, or that is a citizen or resident of or located in, a country that is the target of US Economic Sanctions and dealing with that person or entity would constitute a violation of US Economic Sanctions.*

*Each Party represents and warrants that it is not, and is not owned or controlled by:-*

*(i) a person named on the SDN List or any Equivalent List; or*

*(ii) a government, entity or resident of a country that is the target of US Economic Sanctions.*

*Each Party shall refrain from taking any action that would result in a violation by the other Party of any Economic Sanctions.*

### 42. NEGLIGENCE BY OWNER'S EMPLOYEES
*The Pilots, Master, Officers and Crew of this vessel, and any tugboats person or facility assisting the vessel, shall not be Agents or employees of the Charterer and Charterer shall not be liable for loss or damage or claims resulting from or arising out of negligence or errors of any of them, while the vessel is proceeding to/from or lying at any place of loading or discharging*

### 43. CHANGE OF MANAGEMENT
*The vessel shall not change ownership, flag, class, technical and/or crew management ("a change") during the currency of this voyage without Charterer's prior approval which shall not be withheld unreasonably. If and when a request to approve a change is received from Owner, the proposed new Owner and/or managers shall be assessed by Charter's vetting officer prior to Charterer's approval being granted.*

### 44. ARREST/DETENTION BY A THIRD PARTY
*In the event of arrest/detention or other sanction levied against the vessel through no fault of Charterer, Owner shall indemnify Charterer for any damages, penalties, costs and consequences and any time vessel is under arrest/detained and/or limited in her performance is fully for Owner's account and/or such time shall not count as laytime or if on demurrage, as time on demurrage.*

*In the event of arrest/detention or other sanction levied against the vessel through no fault of Charterer, Charterer shall be entitled, in Charterer's option, to terminate the Charter. Termination or failure to terminate shall be without prejudice to any claim for damages Charterer may have against Owner.*

### 45. WAR CANCELLATION
*If war or hostilities break out between any two or more of the following countries [●], [●], [●]. [●], [●] then both Owner and Charterer shall have the right to cancel this charter.*

### 46. PRIVATE AND CONFIDENTIAL
*This fixture and any details thereof to be kept absolutely private and confidential by all parties involved.*

### 47. COMPLIANCE WITH LAWS (INCLUDING ANTI-BRIBERY AND CORRUPTION)
*Each Party undertakes that it will comply with all laws applicable to it, including but not limited to anti-bribery and corruption laws, in connection with the transactions contemplated by this Charter.*

*Notwithstanding anything to the contrary stated or implied in this Charter, no provision of this Charter shall be interpreted or applied so as to require either party or any of its affiliates to take, or to refrain from taking, any action in connection with this Charter, that would cause it or any of its affiliates to violate applicable laws and regulations of the US, the UK, the EU, or the United Nations (including US Laws restricting participation in or compliance with certain foreign boycotts, directly or indirectly (as contained in the U.S. Export Administration Act of 1979 and the U.S. Internal Revenue Code) and Economic Sanctions).*

           **OWNERS:**                    **CHARTERERS:**

*Signed for and on behalf of Owners:*

This Charter Party is a computer generated copy of the "AMWELSH 93" form printed by authority of the Association of Ship Brokers & Agents (USA), Inc., using software which is the copyright of Strategic Software Ltd. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original ASBA approved document shall apply. The Association of Ship Brokers and Agents (USA), Inc. and Strategic Software Ltd. assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this document.